# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In the Matter of the Welfare of<br><br>E.D.,<br><br>Minor Child.<br><br>DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>L.H.,<br><br>Appellant. | No.  48121-9-II<br>(consolidated with No. 48161-8-II)<br><br><br><br>PUBLISHED OPINION |

JOHANSON, P.J.  — The Department of Social and Health Services (DSHS) filed a petition to terminate L.H.'s parental rights to her youngest child, E.D.  L.H. appeals the juvenile court's ruling denying her motion to continue the termination trial and its order terminating her parental rights.  She argues that (1) the juvenile court abused its discretion by denying her motion to continue the trial, (2) substantial evidence does not support two of the juvenile court's findings, and (3) the juvenile court misapplied the best interest of the child standard.  We affirm the juvenile court's termination of L.H.'s parental rights regarding E.D.

FACTS

I.  BACKGROUND

A.  FIRST DEPENDENCY

L.H. had her first child in 2006, when she was 18 years old or younger, and then she had a second child two years later.  Shortly after the birth of the second child, L.H. exhibited signs of being an unfit parent.  She suffered from mental illness and drug and alcohol addiction, and she lacked the ability to maintain a stable household.

Child Protective Services placed L.H.'s two children into protective custody, and DSHS filed a dependency petition soon after.  Although the children were returned to L.H. more than once, they were removed again.  While they were in L.H.'s care, the children were not in good health; the youngest child was in the first percentile for weight, and DSHS determined that he was failing to thrive.  Also L.H. permitted her children to live in unsanitary conditions, and she violated court orders.[1]

From 2009 to 2011, during dependency proceedings pertaining to her two children, DSHS provided an extensive number of in-home and out-of-home services to L.H. including mental health counseling, domestic violence treatment, in-home help with cooking, parenting, and household skills, and financial assistance in the form of housing vouchers and aid with utility payments.  L.H. was able to obtain an apartment and both the children were returned to her care.  But shortly thereafter, L.H. again demonstrated an inability to provide a safe home environment.

---

[1] L.H. disregarded the requirement that DSHS authorize any adult who would be watching her children.

L.H. continued to allow unauthorized persons in the residence, failed to appear at therapy sessions, and did not avail herself of in-home services. In 2009, L.H. completed alcohol abuse treatment, but she relapsed the following year. In 2011, L.H. relinquished her parental rights to one child, and the juvenile court placed the other child with that child's father.

## B. BIRTH OF E.D. AND START OF DEPENDENCY

After the loss of her two children in 2011, L.H. made no appreciable lifestyle improvements. L.H. used methamphetamine and committed criminal offenses. She lost her housing voucher for failing to pay a portion of the rent and causing disturbances for which the police had to be called.

In 2013, L.H. successfully completed an in-patient drug treatment program, but she relapsed shortly thereafter. At this point, L.H. was pregnant with her third child, E.D., but she continued to use methamphetamine. Throughout this period, L.H. failed to maintain gainful employment.

In November 2013, L.H. was arrested and charged with several felonies. In February 2014, L.H. gave birth to E.D. while she was incarcerated awaiting resolution of her criminal charges. Two days later, DSHS filed a dependency petition as to E.D. and placed E.D. into foster care.

## C. DRUG COURT AND INCARCERATION

Social worker Emily Alvarado requested that L.H. remain in the community where she could continue to avail herself of DSHS's services. Alvarado was hopeful at this point that reunification with E.D. could be accomplished. L.H. entered drug court and was permitted a special exception whereby she would have been allowed to visit with E.D. and receive mental health treatment during the work release phase of her drug court agreement. But L.H. committed

two infractions during the first phase of the program: attempting to obtain methamphetamine and for assault. As a result, L.H. was terminated from the drug court program. In September 2014, when E.D. was nearly seven months old, L.H. was convicted as originally charged.

For these crimes, L.H. received a prison-based drug offender sentencing alternative, RCW 9.94A.660, sentence that required her to serve 36.75 months confinement followed by 36.75 months of community custody. L.H.'s projected release date was December 2015. L.H. was then transferred to prison, where she remained at the time of the termination trial. Once L.H. was at prison, the juvenile court permitted L.H. visitation with E.D., which began in October 2014. L.H. had 14 two-hour visits. During these prison visits, L.H. did not have to provide food, change diapers, or meet other daily needs of an infant. On December 16, when E.D. was 10 months old, DSHS filed the termination petition. E.D.'s foster family wished to adopt her.

During her incarceration and during the dependency/termination proceedings, L.H. had several meaningful visits with E.D. She also wrote letters and sent gifts to E.D, and she attended a number of programs, including chemical dependency programs, general educational development courses, parenting classes, and mental health courses. Counselors, social workers, and other staff noticed L.H.'s improvements and spoke highly of her progress.

But L.H.'s mental health issues persisted. On at least four occasions in 2014 and 2015, L.H. consulted with Steven Baltz, a psychiatric nurse practitioner at the prison facility. According to Baltz, L.H. exhibited signs of depression, discussed her issues with post-traumatic stress disorder (PTSD) and anxiety in crowds, and, most notably to him, she looked like a very sad and depressed person.

In March and April 2015, L.H. also saw Dr. Rodney Davis, a psychologist at the women's prison. L.H. discussed her difficulty with anxiety and experiences with panic attacks. Although Dr. Davis noted that L.H. displayed a genuine interest in learning how to cope with these issues, he also concluded that L.H.'s anxiety issues were "more significant than [he] had previously realized." Ex. 37. In his view, her challenges appeared to have "complex sources in her life experience [and] definitely include[d] traumatic stress." Ex. 37.

D. COMMUNITY PARENTING ALTERNATIVE AND MOTION TO CONTINUE TERMINATION TRIAL

Meanwhile, after a trial continuance, the juvenile court scheduled the termination trial for July 2015. In the spring of 2015, L.H. became interested in placement into a community parenting alternative (CPA) program, and she began to take the steps necessary to be accepted. L.H. had the support of both her counselors and Alvarado. By early June, L.H.'s application had been approved at the first of three tiers of the review process, and the program was actively looking for placement prospects for her. The CPA program would have created additional visitation opportunities and could have prompted L.H.'s early release into a group home.

On July 1, as the CPA program board was considering her for placement, L.H. moved to continue her trial date for four months. She argued that a continuance would provide her the opportunity to be admitted and released into the CPA program, where she would be better suited to remedy her parental deficiencies, making reunification more likely. But the court-appointed special advocate, Ashley Pope, objected to a continuance.

Pope noted that E.D. had been in foster care by this time for 16 months—E.D.'s entire life. Pope also pointed out that although it seemed as though the CPA program was a realistic and even likely possibility, L.H. had not yet been fully approved, and no professional seemed to agree on

an absolute time line for her admittance into the program. Pope believed that it could be an additional year before reunification without any setbacks and argued to the juvenile court that the "[n]ear future" for a child of E.D.'s age was "incredibly soon" or "within a few months." Report of Proceedings (RP) (July 1, 2015) at 10; Clerk's Papers (CP) at 141. The juvenile court agreed and denied L.H.'s continuance motion.

## II. TERMINATION TRIAL

In late July 2015, the termination trial occurred. Following extensive testimony and numerous witnesses from both parties, the juvenile court found that termination was appropriate because DSHS had established by clear, cogent, and convincing evidence that each of the six termination factors required by RCW 13.34.180(1)(a) through (f) had been met and that termination was in the best interest of the child under RCW 13.34.190(1).[2] The juvenile court found, in relevant part, that

> [t]he mother is not currently fit to parent [E.D.] due to her poor parenting skills, her mental health diagnoses (depression, severe anxiety, and PTSD) that impact her ability to parent, her ongoing chemical dependency that impacts her ability to parent, and her inability to provide stable housing for her child.

CP at 315.

> From the time the first dependency ended in October of 2011 until her arrest and incarceration in November 2013, the mother did not make any improvements in her life. She did not work, used methamphetamine, and committed a number of serious criminal offenses, including residential burglary. Since her arrest and incarceration, the mother has made some poor choices [regarding drug use and an assault] and has also taken a number of steps to improve her life [citing other findings of fact]. The mother's recent improvements do not resolve the mother's current parental unfitness.

---

[2] L.H. does not contest factors (a) through (d) on appeal.

CP at 317.

> There is little likelihood that conditions will be remedied so that [E.D.] can be returned to the mother in the near future. "Near future" is considered from the perspective of the child. It would be a minimum of 6 months before [E.D.] could be placed with her mother and the court finds that 6 months is not the near future for this child. [E.D.], who is 18 months old, has been in foster care for her entire life. She deserves, and the governing statutes require, permanency for the child.
>
> a. If the mother participates in the CPA program, the mother would reside at an Oxford House in Olympia until at least December 2015. In this setting, [E.D.] would not be able to reside with her mother because of Oxford House restrictions. If the mother did not participate in the CPA program, she would be released from prison to the community in December 2015 and would need housing at that time. In either situation, the mother does not have a specific plan for obtaining housing adequate for her and her daughter starting in December 2015.
>
> b. The mother has a long history of making poor decisions as they relate to parenting. When she had placement of her older children during the prior dependency, she missed important medical appointments for her children and consistently used poor judgment when deciding who would care for her children. Additionally, she failed to provide for their nutritional and emotional needs. Even if the mother is able to provide housing adequate for herself and her daughter [E.D.] as early as December 2015, the mother would still need to demonstrate the ability to perform daily parenting tasks, such as feeding the child nutritional meals, caring for the child during extended periods, and providing for the child's emotional needs.

CP at 317.

> Continuation of the parent and child relationship clearly diminishes [E.D.]'s prospects for early integration into a stable and permanent home because there is little likelihood of conditions being remedied such that [E.D.] could be returned to her mother in the near future. The foster family would like to adopt [E.D.] and cannot do so as long as the legal relationship between the mother and [E.D.] exists. Adoption of [E.D.] would provide the permanency to which she is entitled.
>
> a. Given that the mother is incarcerated, the court makes the determination that continuation of the parent and child relationship clearly diminishes [E.D.]'s prospects for early integration into a stable and permanent home after determining whether the mother has maintained a meaningful role in [E.D.]'s life during the mother's incarceration, pursuant to RCW 13.34.145(5)(b). RCW 13.34.180(1)(f).

CP at 318.

7

The juvenile court made these determinations despite its several other findings that were favorable to L.H., including that L.H. had manifested concern for E.D., had sent letters and gifts, and had visited with E.D. as frequently as her incarceration permitted. L.H.'s efforts to build a relationship had been positive and consistent, and the Department of Corrections personnel believed that L.H. was committed to improving herself and making herself ready to parent. Although the juvenile court believed that continued involvement of the parent in the child's life would be positive, it found that this could happen only if the termination petition was denied. The juvenile court again noted that E.D. was 18 months old and deserved permanency in the near future and that a decision to continue the parent's involvement in the child's life was not in the child's best interest.

The juvenile court found by a preponderance of the evidence that termination of the parent-child relationship was in E.D.'s best interest. Accordingly, the juvenile court granted DSHS's termination petition. L.H. appeals.

## ANALYSIS

### I. L.H.'S MOTION TO CONTINUE THE TERMINATION TRIAL

L.H. first argues that the juvenile court abused its discretion by denying L.H.'s motion to continue the termination trial. She contends that she was prejudiced because without the continuance, the juvenile court was deprived of necessary information and she was deprived of the opportunity to present relevant evidence. We disagree and conclude that the juvenile court did not abuse its discretion when it denied the continuance motion.

We review a decision to deny a continuance for manifest abuse of discretion. *In re Dependency of V.R.R.*, 134 Wn. App. 573, 580-81, 141 P.3d 85 (2006). "The juvenile court abuses

its discretion when its decision is manifestly unreasonable or based on untenable grounds." *In re Welfare of R.H.*, 176 Wn. App. 419, 424, 309 P.3d 620 (2013). Under a manifest abuse of discretion standard, "[t]he trial court's decision will be affirmed unless no reasonable judge would have reached the same conclusion." *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985).

The juvenile court "takes into account a number of factors, including diligence, due process, the need for an orderly procedure, the possible effect on the trial, and whether prior continuances were granted." *V.R.R.*, 134 Wn. App. at 581. "Terminations are fact specific and must be decided on a case by case basis." *In re Welfare of N.M.*, 184 Wn. App. 665, 672, 346 P.3d 762 (2014). "Denial of a motion to continue violates due process if the parent can show 'either prejudice by the denial or the result of the trial would likely have been different if the continuance was granted.'" *R.H.*, 176 Wn. App. at 425 (quoting *V.R.R.*, 134 Wn. App. at 581).

Our legislature has directed courts to resolve conflicts between the rights of parents and children in favor of the child in proceedings of this nature. RCW 13.34.020. That includes the child's right to a permanent home and a speedy resolution of these proceedings. RCW 13.34.020. The law creates a sense of urgency by requiring, absent compelling circumstances, that a petition for termination of parental rights be filed whenever a child is in foster care 15 of the past 22 months. RCW 13.34.145(1)(c), (4)(b)(vi).

L.H. argues that the juvenile court abused its discretion by denying her continuance because she was poised for acceptance into the CPA program and, had she been accepted, she would have had an opportunity to participate and would have been able to avail herself of services that were not accessible while she was incarcerated. By obtaining early release into a group

facility, L.H. believed that she could have worked to remedy her parental deficiencies in a manner that would have permitted her relationship with E.D. to continue and preclude termination of her parental rights to E.D.[3]

To support the proposition that she was entitled to a continuance to make this showing, L.H. relies on this court's decision in *R.H.* There, the court held that a juvenile court in a termination proceeding abused its discretion by denying a timely continuance motion that was brought specifically to allow time for a home study—which began four months before trial and was well under way—to determine whether a willing family member qualified as an available guardian such that termination was not required. *R.H.*, 176 Wn. App. at 423-24.

But here, L.H.'s motion was unrelated to any request for specific information. Rather, L.H. merely wanted additional time to try to remedy her parental deficiencies in a general sense. While it is possible that L.H. could have ultimately demonstrated adequate capability as a parent at some time in the future, it was not possible to identify any particular time frame in which she would accomplish that goal. Unlike the home study in *R.H.*, L.H was still waiting for a decision as to whether she would be accepted into the CPA program. Also, L.H.'s placement into a CPA program with the possibility that she could remedy parental deficiencies in no way guaranteed that any information, material to the court's ability to decide whether DSHS had met its burden, would be

---

[3] To the extent L.H. argues that the juvenile court violated due process by denying her motion to continue, we disagree. At most, L.H. argues that she was denied an opportunity to have more time to try to remedy her parental deficits. L.H. has not shown prejudice resulting from the denial or that the result of the trial would likely have been different if the continuance was granted. These speculative assertions of prejudice are insufficient to support a due process violation claim.

obtained. The juvenile court could make that determination based on the evidence before it. L.H. was merely requesting more time before it did so.

Approximately three weeks before trial, L.H. asked the juvenile court to continue the trial date for four months. At the time, L.H. was in the midst of the CPA program approval process. Although it was a likely possibility, there was uncertainty as to whether L.H. would be approved and, if so, when that would occur.[4] Here, the juvenile court was concerned about E.D.'s right and need for permanency. E.D. was then a 16-month-old child who had been in foster care since birth.

In termination proceedings, trial courts must resolve conflicts between the rights of parents and children in favor of the child's right to a permanent home and a speedy resolution of the proceedings. RCW 13.34.020, .145(1)(c). We hold that the juvenile court's ruling denying L.H's trial continuance motion was not manifestly unreasonable and that it did not abuse its discretion under these circumstances.

II. SUBSTANTIAL EVIDENCE SUPPORTS EACH CHALLENGED FINDING

L.H. next contends that substantial evidence does not support two of the juvenile court's findings. The challenged findings relate to factors of RCW 13.34.180(1)(e), "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," and of RCW 13.34.180(1)(f) that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." L.H. also asserts

---

[4] After the hearing on her continuance motion, but by the time of trial or sometime during it, L.H. did receive final approval for admittance into the CPA, but the juvenile court could not have predicted this outcome.

that the juvenile court erred by reasoning in a manner that made termination a foregone conclusion based on incarceration alone. These arguments fail.

## A. LEGAL PRINCIPLES

The juvenile court may order termination of a parent-child relationship if DSHS establishes the six elements in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence and that termination is in the child's best interest. RCW 13.34.190(1). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)). DSHS also must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. RCW 13.34.190(1)(b).

Because the juvenile court has the advantage of observing the witnesses, deference to the court is particularly important in termination proceedings. *In re Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). We do not review credibility determinations or weigh the evidence. *Sego*, 82 Wn.2d at 739-40.

We limit our analysis to whether substantial evidence supports the juvenile court's findings of fact. *Sego*, 82 Wn.2d at 739. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986).

## B. LIKELIHOOD TO CORRECT DEFICIENCIES

L.H. argues that the juvenile court's finding that there was little likelihood that she would correct her parenting deficiencies in the near future was unsupported by substantial evidence. Specifically L.H. contends that the juvenile court erred by relying on her "distant past." Br. of

Appellant at 12. However, we disagree because the juvenile court relied not only on L.H.'s historical struggles, but also on issues that she continued to face at the time of the termination trial.

To terminate a parent's rights, the juvenile court must find that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). In determining whether RCW 13.34.180(1)(e) has been met, the focus is on whether parenting deficiencies have been corrected. *In re Dependency of T.R.*, 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). The juvenile court may not terminate a parent's rights unless it finds that the parent is currently unfit to adequately care for the dependent child. *In re Welfare of A.B.*, 168 Wn.2d 908, 918, 232 P.3d 1104 (2010). "When it is eventually possible but not imminent for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." *In re Welfare of C.B.*, 134 Wn. App. 942, 958-59, 143 P.3d 846 (2006) (citing *T.R.*, 108 Wn. App. at 166). Absent compelling circumstances, the law requires a particular sense of urgency to achieve permanence once a child has been in out-of-home care for 15 months. RCW 13.34.145(1)(c).

The juvenile court may consider the parent's history of parenting and compliance with services to determine whether conditions are likely to be remedied in the near future. *In re J.C.*, 130 Wn.2d 418, 428, 924 P.2d 21 (1996). A determination of what constitutes "near future" depends on the child's age and the circumstances of the placement. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005); *see also In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990) (six months not in near future of fifteen-month-old); *In re A.W.*, 53 Wn. App. 22, 27, 32, 765 P.2d 307 (1988) (one year not in near future of three-year-old); *In re Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983) (eight months not in the foreseeable future for a four-

year-old); *T.R.*, 108 Wn. App. at 165-66 (one year not in the near future for a six-year-old); *In re Dependency of D.A.*, 124 Wn. App. 644, 656-57, 102 P.3d 847 (2004) (eighteen months not in the near future for an almost four-year-old).

"Imprisonment alone does not necessarily justify the termination of parental rights. But the parent's resulting inability to perform his or her parental obligations is certainly relevant to the child's welfare. Also relevant are the nature of the parent's crimes and the parent's conduct before being imprisoned." *In re Dependency of J.W.*, 90 Wn. App. 417, 426, 953 P.2d 104 (1998) (citations omitted). Further, when a parent is incarcerated, a juvenile court must also consider whether the parent has nevertheless maintained a meaningful role in his or her child's life and whether particular barriers exist to meaningful contact with the child. RCW 13.34.180(1)(f). A juvenile court must consider whether an incarcerated parent could maintain a meaningful role in the child's life and whether DSHS made reasonable efforts to help the incarcerated person remedy parental deficiencies. *In re Termination of Parental Rights to M.J.*, 187 Wn. App. 399, 408, 348 P.3d 1265 (2015).

Regarding L.H.'s likelihood to remedy her parental deficiencies in the near future, the juvenile court found that it would be a minimum of six months before E.D. could be placed with her mother and that this length of time was too long for a child of E.D.'s age, who had been in foster care for the child's entire life. At the time of trial, E.D. was over 15 months old. *See* RCW 13.34.145(1)(c). This was true even if L.H. had been released into the CPA program because E.D. would not have been permitted to reside with L.H. at the group home. Further, the juvenile court found that L.H. had a history of poor decision making as it related to parenting, using poor

14

judgment when deciding who to allow in the presence of her children, and struggling to feed her children and to provide them adequate housing.

Additionally, regarding current unfitness, at the time of trial, L.H. had serious substance abuse issues and although she completed a chemical dependency program, she had not demonstrated a sustained period of success in society. The juvenile court also noted that L.H. continued to suffer from depression, anxiety, panic attacks, and PTSD so that she would need extensive mental health treatment and sustained management of these conditions before E.D. could be placed with her again. Finally, the juvenile court acknowledged that L.H. could not begin to address these issues in the community until December 2015.

L.H. argues that the juvenile court erred by relying on her "distant past" to support this element. She relies on *C.B.* to support this proposition. In *C.B.*, this court held that if the parent has shown improvement for a period of time following the filing of the termination petition, the State may not rely solely on past performance to prove that there is little likelihood that the parent will be reunited with her child in the near future. 134 Wn. App. at 953. But *C.B.* is distinguishable. First, the juvenile court did not rely solely on past performance. Instead, L.H.'s parenting history and difficulty maintaining a safe, clean household along with her previous sobriety issues were only part of L.H.'s overall unfitness on which the juvenile court relied. Alvarado testified that L.H.'s current mentality "mirror[ed]" that of her prior dependencies and that Alvarado was concerned that L.H. would "fall[ ] apart" again. 4 RP at 618, 620.

Moreover, L.H.'s mental health issues were not solely in the past; they are persistent and ongoing. She met with psychiatrists and nurse practitioners in the weeks and months before trial with concerns about the very issues that rendered her at times unable to complete basic daily tasks.

And in *C.B.*, the "near future" aspect of the factor was not at issue because the parent in that case could have improved during the relevant time frame. 134 Wn. App. at 958. Here, however, Alvarado testified that the minimum period of time before an in-home dependency could be considered was six months. Alvarado also explained that this six-month period would have to be one in which L.H. demonstrated consistent progress because her past experience with L.H. revealed that she would often make some progress until she felt overwhelmed and would "fall[ ] apart." 4 RP at 620.

In Alvarado's view, a six-month time frame was too long for E.D. based on the child's age and her having been in foster care for her entire life. We have held that a juvenile court's ruling was reasonable where it concluded that six months was not in the near future for a fifteen-month-old child, an age very close to E.D.'s at the time of trial. *P.D.*, 58 Wn. App. at 27. And because E.D. had been in foster care for over 15 months, the juvenile court had a sense of urgency regarding permanency for E.D. *See* RCW 13.34.145(1)(c). Consequently, we hold that the evidence was sufficient to persuade a fair-minded, rational person of the truth of the asserted premise and, therefore, substantial evidence supports the juvenile court's finding that there was little likelihood that conditions would be remedied so that the child could have been returned to the parent in the near future.

## C. EARLY INTEGRATION

L.H. argues that due to her rapid improvement while incarcerated and the juvenile court's clear recognition of these efforts and the barriers imposed by confinement, the juvenile court erred by finding that RCW 13.34.180(1)(f) had been met. She argues that the juvenile court erred by considering the factors in a manner that made termination a foregone conclusion because she was

16

incarcerated. By extension, she also suggests that if all the "incarceration factors" weigh in a parent's favor, yet termination is nevertheless granted, no incarcerated person would ever prevail against a termination petition. We disagree with L.H.'s contentions.

To meet its burden when seeking termination, DSHS must also prove that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). RCW 13.34.180(1)(f) further states,

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

The court's assessment of whether an incarcerated parent maintains a meaningful role in the child's life *may* include consideration of the following:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
> (v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and
> (vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b).

Regarding the early integration factor, the juvenile court here found that E.D. had a potential adoptive family and that the continued relationship between L.H. and E.D. would diminish the prospect of E.D.'s integration into that permanent and stable home. The juvenile court also found that this was so largely because of L.H.'s incarceration. As part of its determination, the juvenile court clearly considered each of the "incarceration factors."

Several of the juvenile court's findings were favorable to L.H., including that L.H. had manifested concern for E.D., had sent letters and gifts, and had visited with E.D. as frequently as her incarceration permitted. The juvenile court acknowledged that L.H. recognized, at least to some extent, the efforts of DSHS to provide her with services. The juvenile court further found that L.H.'s efforts to build a relationship had been consistent and that the Department of Corrections personnel believed that L.H. was committed to improving herself and making herself ready to parent. Finally, the juvenile court noted that although her continued involvement in E.D.'s life "would be positive," the services available to L.H. had been limited because of her incarceration. CP at 319.

First, the juvenile court did not err because the legislature's directive is to *consider* the fact of incarceration and the unique barriers it may present. RCW 13.34.180(1)(f). The statutory scheme then provides certain factors courts may *consider* when determining whether a parent maintains a meaningful role in a child's life. RCW 13.34.145(5)(b). "A 'consideration' of evidence ultimately means a weighing or balancing of facts, along with a resolution of that weighing." *M.J.*, 187 Wn. App. at 409. The juvenile court here clearly did so.

L.H. seems to argue that a favorable finding on each "incarceration factor" necessarily compels the conclusion that termination is not warranted. But the legislature has not said this, and

we do not add language to an unambiguous statute even if we believed the legislature intended something else but did not adequately express it. *Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155 (2006). The statute provides that the court "shall consider" the incarceration factors. Based on the plain language of the statute, no more than "consideration" is required. The juvenile court certainly considered the incarceration factors here.

Second, L.H. contends that no incarcerated person could ever prevail in a hearing on a termination petition under our interpretation of RCW 13.34.145(5)(b). But our courts adhere to the principle that a juvenile court's decision to terminate a parent-child relationship is fact specific and must be decided on a case-by-case basis. *N.M.*, 184 Wn. App. at 672. Any number of factors could have effected a different outcome. The child's age, the length of the dependency, or the duration of foster care placement all make a child's integration into a stable home more or less critically time sensitive. Or the parent could have demonstrated that she had overcome her mental health problems or drug addiction. Consequently, we reject the contention that no incarcerated person may ever prevail in a termination trial because each case is decided on its own set of facts.

The legislature mandated that our trial courts consider the incarcerated parent's ability to maintain a meaningful role in her child's life, despite the barriers imposed by incarceration. *M.J.*, 187 Wn. App. at 409. But it did not direct trial courts to disregard the negative effects that incarceration may have on a delicate parent-child relationship. It also did not direct the trial court to ignore the child's need for timely permanency. The statute notably does not mandate that a certain weight be afforded to the incarceration considerations. Thus, we hold that the juvenile

court, by balancing all the relevant considerations and by making all of the required findings, did not err under these circumstances.[5]

### III. BEST INTEREST OF THE CHILD

L.H. argues that the juvenile court misapplied the best interest of the child standard by finding that continuation of the parent-child relationship "'would be positive,'" while simultaneously finding that termination was in E.D.'s best interest. Br. of Appellant at 22 (capitalization omitted). We disagree.

After proving that all six elements of RCW 13.34.180(1)(a) through (f) have been met, DSHS must then prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. RCW 13.34.190(1)(b); *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228, 896 P.2d 1298 (1995). Although parents have a fundamental liberty interest in the care and custody of their children, the paramount consideration in a termination proceeding is the welfare of the children. *In re Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979). Children have the right to a safe, stable, permanent home and a speedy resolution to dependency and termination proceedings. RCW 13.34.020.

"When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020. Where a parent has been unable to rehabilitate over a lengthy dependency period, a juvenile court is "'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to

---

[5] L.H. also argues that the court conflated the "best interest" analysis with the factors in RCW 13.34.180(1)(e) and (f), but RCW 13.34.145(5)(b) also permits courts to consider the child's best interest when determining whether the parent has a meaningful relationship with the child.

rehabilitate himself.'" *T.R.*, 108 Wn. App. at 167 (alterations in original) (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

The juvenile court found that "[c]ontinued involvement of the parent in the child's life would be positive. However, continued involvement is possible only if the termination petition is denied and the dependency remains in effect. [E.D.] is 18 months old and deserves permanency in the near future, considered from the child's perspective on time. Therefore, a decision to continue the parent's involvement in the child's life is not in the child's best interests." CP at 319. Although the juvenile court recognized that L.H. did positive things in her time with E.D. and that there was a positive parent-child bond, it concluded that the parental bond did not outweigh the child's need for permanence. There is no indication that the juvenile court misapplied the best interest standard.

Juvenile courts are required to determine whether termination is in the best interest of the child by a preponderance of the evidence. RCW 13.34.190(1)(b). The juvenile court here did exactly that.

We affirm the juvenile court's termination of L.H.'s parental rights regarding E.D.

JOHANSON, P.J.

We concur:

SUTTON, J.

LEE, J.

21