# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>E.R.M. | No. 86993-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — After a four-year dependency, the superior court entered an order terminating A.J.'s and R.M.'s parental rights to E.R.M. Both parents appeal the termination orders. The father, R.M., contends that the Department of Children, Youth, and Families (Department) failed to offer him all necessary services, prove that there was little likelihood he would remedy his parenting deficiencies in the near future, and failed to show that termination was in the best interests of E.R.M. Substantial evidence supports the superior court on each of these challenged findings, and we therefore affirm the termination order as to R.M. In response to the mother, A.J.'s, appeal, the Department filed a motion to vacate, conceding error and asserting it did not show that all necessary court ordered services were expressly and understandably offered or provided. We treat the Department's "motion to vacate" as a concession on appeal, and we accept its concession, vacate the termination order as to A.J., and remand for further proceedings.

I

E.R.M. was born in April 2018. In March 2020, E.R.M. and her parents were living in a hotel, having been displaced by a house fire one year earlier. On March 23, 2020, E.R.M., while under the supervision of her parents, ingested methamphetamine. Unaware that E.R.M. had ingested methamphetamine, E.R.M.'s parents brought her to a hospital because she was "fussy and inconsolable." E.R.M.'s urinalysis (UA) tested positive for methamphetamine. R.M. produced a bottle with a hole in it and a small amount of red liquid, which he claimed was how E.R.M. had ingested the methamphetamine. R.M. believed the bottle was a smoking device, and that it had been left in his bathroom by a former schoolmate, who he thought was homeless, and whom he had invited into his hotel room for a shower and a meal.

Police took E.R.M. into protective custody, and the Department filed a dependency petition on March 26, 2020. A.J. and R.M. entered into agreed dependency orders in June 2020. The superior court ordered E.R.M. placed with her maternal grandmother, and she has continued in her placement there. The Department filed a petition for termination in June 2022, and after a termination trial, the superior court entered a termination order for both parents in June 2024.

At the outset of the dependency, the court ordered R.M. to complete the following services: (1) random UAs, (2) a chemical dependency evaluation and to follow recommendations for chemical dependency treatment, (3) an evidence based parenting support program, (4) Impact of Domestic Violence on Children seminar, and to (5) cooperate with establishing paternity. Later, the court ordered

R.M. to complete a domestic violence assessment and to follow treatment recommendations.

R.M. submitted some UAs, but none in the year prior to trial. R.M. completed a chemical dependency evaluation, but he did not complete the recommended chemical dependency treatment. He completed the court ordered genetic testing to confirm that he was E.R.M.'s father. R.M. completed the Impact of Domestic Violence on Children seminar. And he completed several parenting classes. But he failed to follow through with other recommended parenting classes. R.M. had difficulty completing services while being employed and having visits with his children. A social worker offered to stagger R.M.'s services so that he would not have to complete everything at once, but his attendance either didn't improve or he stopped attending altogether.

In May 2021, R.M. completed his domestic violence assessment. Based on that assessment, a social worker referred R.M. to a 52-week treatment program. R.M. claimed that he could not attend the program because it would either cost too much money to drive or take too much time on the bus. A social worker provided him with a referral for domestic violence treatment with a remote provider online but R.M. did not contact the provider or follow up on the referral.

An alleged incident of domestic violence occurred in July 2021. A.J. was hospitalized with "markings around her neck and a split lower lip." A sheriff's deputy interviewed her, but because of her apparent strangulation, she was unable to speak. A.J. answered the deputy's questions affirmatively or negatively by blinking, and she replied affirmatively that R.M. was responsible for her injuries.

A.J. disclosed to both a social worker and her therapist that R.M. had injured her. And A.J. testified that she was hospitalized after "an incident with" R.M. in July 2021. After this incident, R.M. was asked to complete another domestic violence assessment.

R.M. did not complete his second court ordered domestic violence assessment. R.M. testified that he had pending criminal charges and his lawyer advised him to not engage in the second domestic violence assessment because it would be an admission of guilt.

E.R.M. had visits with R.M., but because R.M. lived with his father, who was a smoker, the visits usually took place in the garage. R.M. missed multiple visits with E.R.M. In some instances, a visit that was ongoing would be cancelled because he would leave the garage and go into his house for too long. Observers noted numerous concerns with E.R.M.'s visits. R.M. left a knife with a four-inch blade in a place accessible to E.R.M., there were tools and other unsafe items within E.R.M.'s reach, R.M. left E.R.M. unsupervised in a bath, R.M. would leave E.R.M. unsupervised for 10 to 15 minutes at a time in the garage, R.M. would allow E.R.M. to watch television for lengthy periods during visits, and R.M. would have inappropriate discussions with E.R.M., often raising his voice and shouting at her.

E.R.M.'s therapist testified that E.R.M. said of her father, "I don't want to see him, I don't want to visit him, I wish he would get arrested and go to jail." She then drew a picture of her father and said, "[T]his is my dad, he's a monster." E.R.M. also told her therapist that "dad was mean to mom" and "dad hurt mom."

4

E.R.M.'s therapist testified that E.R.M.'s visits with her parents were triggering her and that they would cause "meltdowns."

At the termination trial, the superior court found that the Department had satisfied the elements required under RCW 13.34.180 by clear, cogent, and convincing evidence as to both parents. The superior court ordered both parents' parental rights terminated. R.M. and A.J. timely appealed.

II

R.M. contends that the superior court erred in entering the termination order against him because the Department failed to prove (1) it had offered him all necessary services reasonably available and capable of correcting his parental deficiencies, (2) there was little likelihood that he would remedy his parental deficiencies in the near future, and (3) that termination was in E.R.M.'s best interests. We disagree.

We review a trial court's termination order to determine whether substantial evidence supports its findings of fact by clear, cogent, and convincing evidence. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Clear, cogent, and convincing evidence means that the facts must be shown to be highly probable. Id. at 478. We review whether the trial court's findings of fact support its conclusions of law de novo. Id. at 477. Termination proceedings are "highly fact-specific" in nature, therefore we defer to the trial court's determinations of witness credibility and persuasiveness of the evidence. Id. Unchallenged findings of fact are accepted as true on appeal. In re Dependency of A.N.C., 24 Wn. App.

2d 408, 416, 520 P.3d 500 (2022), review denied, 1 Wn.3d 1012, 532 P.3d 1024 (2023).

Parents have a fundamental liberty interest in the custody and care of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion). To protect the vital interests at stake, the burden of proof in a termination trial is on the Department and should never be shifted to the parent. In re Parental Rights to M.A.S.C., 197 Wn.2d 685, 698, 486 P.3d 886 (2021). Under the two-step framework for terminating parental rights, first the Department must satisfy the requirements of RCW 13.34.180(1), and then it must show that termination of parental rights is in the child's best interests. K.M.M., 186 Wn.2d at 478. The burden of proof on the Department is to show by clear, cogent, and convincing evidence that it has met the "six statutory requirements laid out in RCW 13.34.180(1)." A.N.C., 24 Wn. App. 2d at 414. The Department must show that termination is in the best interests of the child by a preponderance of the evidence. K.M.M., 186 Wn.2d at 479.

A

R.M. asserts that the Department failed to offer all necessary services because it did not "recommend mental health treatment," provide the service of "Project Safecare," and did not show "insight into R.M.'s economic circumstances." In a trial to terminate parental rights, the Department must prove that it provided "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). Necessary services are those which are needed to address a condition that precludes

reunification between parent and child. K.M.M., 186 Wn.2d at 480. Services "must be tailored to the needs of the individual." In re Parental Rights to D.H., 195 Wn.2d 710, 727, 464 P.3d 215 (2020).

At no point did the Department identify mental health treatment as a necessary service for R.M. To support his assertion that it was a necessary service, R.M. cites "a series of questionable choices" and "abject lack of judgment." R.M. cites no authority that poor decisions and poor judgment necessitate mental health treatment in this context. And R.M. provides no briefing for his claim that Project Safecare was a necessary service beyond including it in an appellate brief heading. On these points, R.M.'s briefing does not meet the requirements of RAP 10.3(a)(6), because R.M.'s brief does not explain why either point is legally supportable, including through the citation of authority. We are unpersuaded that this record should have led to essentially a lay recognition that R.M. needed unspecified mental health treatment to correct parental deficiencies that were instead grounded in chemical dependency, parenting skills, and domestic violence. During the four-year dependency, there was no identification of a need for R.M. to have mental health treatment or that Project Safecare was a necessary service. R.M.'s appellate briefing does not establish otherwise.

R.M. claims the Department was "ambivalent" regarding his ability to access a domestic violence treatment program in Shelton, Washington and regarding his economic circumstances during the dependency. But the record shows that a social worker provided R.M. with a referral for an online domestic violence treatment program so that he would not need to drive to or ride the bus to Shelton.

7

And the superior court found R.M.'s explanation that he could not afford gas to attend his domestic violence treatment program not credible. A social worker offered to stagger R.M.'s services to accommodate his work schedule, but he either did not attend, or stopped attending, those services. Substantial evidence supports the superior court's finding that R.M. was offered all necessary services by the Department.

B

R.M. argues that the Department failed to prove that there was little likelihood his parental deficiencies would be remedied in the near future. One of the statutory elements that the Department must prove is that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.14.180(1)(e). We focus on whether the parenting deficiencies have been corrected. In re Welfare of E.D., 195 Wn. App. 673, 689, 381 P.3d 1230 (2016). "When it is eventually possible, but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." In re Welfare of C.B., 134 Wn. App. 942, 958-59, 143 P.3d 846 (2006).

"The juvenile court may consider the parent's history of parenting and compliance with services to determine whether conditions are likely to be remedied in the near future." E.D., 195 Wn. App. at 689. What constitutes "near future" depends on the child's age and the circumstances of placement. Id. Prior decisions have described the "near future" as being nearer than within one year for children of E.R.M.'s age. See In re Welfare of Hall, 99 Wn.2d 842, 844, 850-

51, 664 P.2d 1245 (1983) (remedy in eight months not considered foreseeable future for four-year-old); In re Dependency of T.R., 108 Wn. App. 149, 164-65, 29 P.3d 1275 (2001) (remedy in one year not considered near future for six-year-old).

The superior court heard testimony that R.M. did not believe he needed to complete his second ordered domestic violence assessment; that he did not recognize his contributions to E.R.M.'s trauma; and that he did not take personal responsibility for E.R.M.'s removal, or demonstrate understanding as to why E.R.M. had been removed from his care. In almost four years, he had not completed his court ordered services. He provided no UAs in the year prior to trial. He did not complete recommended chemical dependency treatment. He did not do a second court ordered domestic violence assessment, nor did he complete the domestic violence treatment ordered from his first assessment. The Department worked to accommodate his situation by staggering his services and by providing referrals for an online domestic violence treatment program, but R.M. still failed to meaningfully progress in his court ordered services. Even if R.M. began engaging with his court ordered services, his domestic violence treatment program alone would take at least 52 weeks. The superior court here never made a factual finding of E.R.M.'s near future, but the circumstances of the case support its ultimate conclusion. Given E.R.M.'s age, almost six at the time of trial, the length of dependency, and R.M. needing at least another year to complete services, substantial evidence supports the superior court's finding that there was little likelihood R.M. would remedy his parenting deficiencies in the near future.

C

R.M. contends that there was not sufficient evidence to support the finding that termination was in E.R.M.'s best interests. He argues that initially he was willing to engage in services, his criminal charge was dismissed, and though he "made a poor choice in letting a transient into the hotel room" it was "understandable." He further asserts that he "did well in services until the case became unreasonably prolonged," and that "there is no evidence of him abusing E.R.M."

" '[T]he criteria for establishing the best interests of the child are not capable of specification' because each case is 'largely dependent upon its own facts and circumstances.' " In re Dependency of K.W., 199 Wn.2d 131, 152, 504 P.3d 207 (2022) (quoting In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980)). When a parent is unable to rehabilitate over a long dependency, the superior court is justified in finding termination to be in the child's best interests. E.D., 195 Wn. App. at 696.

R.M. failed to complete court ordered services related to chemical dependency and domestic violence. He had an inconsistent history of visitation with E.R.M., often cancelling, putting her in unsafe situations, and regularly shouting at her. E.R.M. told her therapist and social worker that she did not want to visit him. E.R.M.'s guardian ad litem and social worker both testified that adoption by her grandmother would be in E.R.M.'s best interests, and her therapist recommended that E.R.M. not be returned to her parents. Adoption is not possible while R.M.'s parental rights remain intact.

The superior court's finding that termination of R.M.'s parental rights was in E.R.M.'s best interests is supported by substantial evidence.

III

With regard to the Department's concession of error as to A.J., the court is concerned about the timing of the Department's recognition of the asserted defect in its proof because of the delay it will cause for E.R.M., and we understand the Department shares this concern. Wash. Ct. of Appeals oral arg., In the Matter of the Parental Rights to E.R.M., No. 86993-1-I (June 5, 2025), at 30 min., 30 sec. to 30 min., 45 sec., https://www.tvw.org/watch/?clientID=9375922947&eventID= 2025061138. The law recognizes a compelling "interest in providing the child with a safe, stable, and permanent home, and a speedy resolution to termination proceedings." C.B., 134 Wn. App. at 951. But "[p]arents have a fundamental liberty interest in the right to the care, custody, and management of their children." In re Welfare of A.W., 182 Wn.2d 689, 702, 344 P.3d 1186 (2015). Appearing through a guardian ad litem, E.R.M. argues on appeal that we should decline the Department's concession and affirm the termination of A.J.'s parental rights. E.R.M. cites trial evidence supportive of the Department's burden at trial. Wash. Ct. of Appeals oral arg., supra, at 33 min., 11 sec. to 33 min., 40 sec. However, we are concerned enough by the Department's position that it did not address A.J.'s needs that we believe affirming over the Department's objection would be inappropriate. Because of the constitutional interest at stake, and after our review of the complete record, we treat the Department's "motion to vacate" as a concession on appeal, and accept its concession that it did not "show that all

necessary and court-ordered services were expressly and understandably offered or provided" to A.J.

The termination order of R.M.'s parental rights to E.R.M. is affirmed. The termination order of A.J.'s parental rights to E.R.M. is vacated and remanded for further proceedings.

*Birk, J.*

WE CONCUR:

_____    _____

In the Matter of the Parental Rights to E.R.M., No. 86993-1-I

CHUNG, J. (concurring in part, dissenting in part) — I concur with the majority in its opinion affirming the termination order as to the father, R.M. However, regarding the termination order as to the mother, A.J., I respectfully dissent from the majority's decision to accept the motion to vacate filed by the Department of Children, Youth, and Families (DCYF) as a concession on appeal and to remand for further proceedings. We should instead limit our review of the termination of the mother's parental rights to the issues she raised on appeal.

A court may terminate parental rights if DCYF proves the elements set out in RCW 13.34.180(1), including "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). In In re Parental Rights to M.A.S.C., our Supreme Court identified the steps that DCYF must take to ensure that it has "expressly and understandably" offered services to a parent:

> Initially, where DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain the extent of the disability and how it could interfere with the parent's ability to understand and benefit from DCYF's offer of services. . . . Next, if reasonable efforts reveal that the parent does have an intellectual disability, then DCYF must tailor its offer of services to ensure that the offer is reasonably understandable to the parent.

197 Wn.2d 685, 699, 486 P.3d 886 (2021). If a termination trial becomes necessary, the trial court must evaluate whether DCYF has understandably

offered services to the parent by "apply[ing] a consistent, objective standard that accounts for the individual circumstances of each case." Id. at 699-700. The M.A.S.C. court further explained,

> To apply the correct standard, the trial court must place itself in the position of an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities. The court must then determine whether DCYF's offer of services was reasonably understandable to the parent based on the totality of the circumstances.

Id. at 700.

Here, after trial, both DCYF and the mother presented proposed orders to the trial court. The mother's proposed findings included the following:

> 2.5    The necessary service of a psychological evaluation was not offered or provided.
>
> 2.6    DCYF had the ability to refer for a psychological evaluation.

In addition, the mother's proposed findings included that "DCYF did not offer or provide" various necessary services, including sexual assault support groups, family therapy between each parent and E.R.M., a high needs parenting class, and referrals for housing. However, A.J. did not propose any findings regarding whether services were "understandably offered."

By contrast, the State's proposed findings regarding the services offered and provided included finding 2.8: "The services offered under RCW 13.34.130 have been expressly and understandably offered or provided, and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided to the parents." This

proposed finding was followed by findings 2.8.1 through 2.8.14, which set out the evidence presented at trial that supported finding 2.8. The trial court adopted without change the State's proposed findings 2.8 and 2.8.1 through 2.8.14.

On appeal, the mother challenged only specific portions of the findings of fact relating to services offered or provided:

1. The trial court's finding that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided" is not supported by the evidence. CP 569 (Finding of fact 2.8).
. . .

3. The court erred in finding that "The mother could access mental health assessment through community providers, including at co-occurring treatment centers to treat chemical dependency and mental health issues." CP 571 (Finding of Fact 2.8.23).

4. The trial court erred in finding that "The facilities that the mother attended for chemical dependency treatment could have also helped her manage her mental health issues." CP 571 (Finding of Fact 2.8.24).

5. The trial court's finding that "a psychological evaluation would [not] have remedied the mother's parental deficiencies in the foreseeable future" is not supported by the evidence. CP 571 (Finding of Fact 2.8.28).

Significantly, the mother did *not* challenge the first part of finding of fact 2.8, that "[t]he services offered under RCW 13.34.130 have been expressly and understandably offered or provided." Unchallenged findings of fact are considered verities on appeal. In re Dependency of J.M.R., 160 Wn. App. 929, 939 n.5, 249 P.3d 193 (2011); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

Nevertheless, in its motion to vacate and remand, DCYF states, "The Department concedes that it did not show that all necessary and court-ordered

3

services were expressly and understandably offered or provided," citing

M.A.S.C., 197 Wn.2d 685. At oral argument, DCYF clarified that its position on

appeal was that the record "does not contain evidence demonstrating that it

made reasonable efforts to determine if A.J. had intellectual limitations that

interfered with her ability to understand the offer and provision of services and, if

so, whether the offer and provision of services needed to be tailored to her

specific needs."[1] DCYF acknowledged that this basis for seeking remand was

different from what the mother argued in her brief.[2] DCYF also acknowledged

that it did not raise the issue of the mother's intellectual disability at trial.[3] Then,

DCYF asserted, "The basis for the reason to know that there may be an

intellectual disability is very much in the record. There is a lot of evidence to that

effect," and, even if the issue had not been raised below, DCYF had "an ongoing

obligation to evaluate the evidence and upon review, there were deficiencies in

this case that were found."[4] Yet DCYF did not identify with specificity what

evidence demonstrated such "deficiencies" on its part, either in its briefing or at

oral argument.

By contrast, A.J. focused her arguments on appeal, both in briefing and at

oral argument, on whether DCYF offered the necessary services of co-occurring

mental health and chemical dependency treatment, as these issues were "both

---

[1] Wash. Ct. of Appeals oral argument, In the Matter of the Parental Rights to E.R.M., No. 86993-1-I (June 5, 2025), at 17 min., 59 sec. through 18 min., 22 sec., video recording by TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2025061138.
[2] Id. at 19 min., 11 sec. through 20 min., 15 sec.
[3] Id. at 24 min., 18 sec. through 24 min., 27 sec.
[4] Id. at 24 min., 39 sec. through 25 min., 20 sec.

identified at the very start, and it was clear she was not making progress" and "was in need of this integrated service."[5] A.J. argued that throughout the trial, the parties had addressed this issue of co-occurring integrated services,[6] but that as to DCYF's new argument on appeal, "[t]here [wa]s no evidence of a cognitive impairment" at trial.[7]

The State has an "urgent" *parens patriae* interest in "preserving and promoting the welfare of the child" with the goal of "provid[ing] the child with a safe, stable and permanent home, and a speedy resolution to termination proceedings." In re T.R., 108 Wn. App. 149, 159, 29 P.3d 1275 (2001). Courts " 'undertake a grave responsibility' when they decide whether to terminate parental rights." In re Welfare of M.B., 195 Wn.2d 859, 868, 467 P.3d 969 (2020) (quoting In re Welfare of Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)). We "attempt to protect the rights of both parents and children, giving primary consideration to the welfare of children." Sego, 82 Wn.2d at 740; see also M.B., 195 Wn.2d at 868 ("where the parents' legal rights and a child's right to basic nurture, physical and mental health, and safety conflict, the child's rights and safety should prevail") (citing RCW 13.34.020).

DCYF's obligations under M.A.S.C., which was decided in 2021, were clear at the time of trial in 2024. "It is DCYF's burden to prove that it satisfied all the necessary elements for termination." M.A.S.C., 197 Wn.2d at 703. Here, the trial court concluded that DCYF met its burden of proving that the services

---

[5] Id. at 7 min., 28 sec. through 7 min., 41 sec.
[6] Id. at 4 min., 37 sec. through 4 min., 41 sec.
[7] Id. at 7 min., 16 sec. through 7 min., 19 sec.

required "have been expressly and understandably offered or provided." The mother has not challenged this aspect of the trial court's findings. And the mother has conceded that there was no evidence of a cognitive impairment at trial.[8]

"Reversing a termination of parental rights risks disrupting any stability a child may have achieved since the termination trial, and we do not make such decisions lightly." M.A.S.C., 197 Wn.2d at 705. The child, E.R.M., was found to be a dependent child on June 4, 2020 as to both the mother and the father and has been with the same relative placement since 2020. On this record, I would not accept DCYF's concession and would deny its motion to vacate. We are limited in our review on appeal to assignments of error and issues raised by the appellant. RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."); RAP 10.3(g) ("The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto."). The mother was represented at trial. In the trial court proceedings, no one raised the error DCYF now raises.[9] On appeal, the mother did not file a response to DCYF's motion to vacate, much less join it.

This court should limit its review of the trial court's termination of the mother's parental rights to the errors and issues that she identified in her appeal.

---

[8] Of course, the mother was "not required to prove that DCYF's offers of services were not understandable; it [i]s DCYF's burden to prove that they were." M.A.S.C., 197 Wn.2d at 703.

[9] "A party may raise a claim of error which was not raised by the party in the trial court *if* another party on the same side of the case has raised the claim of error in the trial court." RAP 2.5(a).

To the extent the majority opinion instead treats DCYF's motion—brought on a basis different from the mother's appeal—as a "concession" warranting remand, I dissent.

_Chung, J._