# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>

In the Dependency of

E.A.E.,
DOB: 6/18/14


STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

            Respondent,

    v.

JERRY JASSO-RODRIGUEZ,

            Appellant.

</td><td>

No. 75110-7-I

DIVISION ONE




UNPUBLISHED OPINION



FILED: <u>April 24, 2017</u>

</td></tr>
</table>

SPEARMAN, J. — Jerry Jasso-Rodriguez appeals from the order terminating his parental rights to his daughter E.E. He contends that the juvenile court failed to adequately consider the statutory factors applicable to incarcerated parents and that the Department of Social and Health Services (Department) failed to prove that (1) continuation of the parent-child relationship diminished E.E.'s prospects for integration into a stable and permanent home; (2) all necessary services were offered or provided; and (3) there was little likelihood that parental deficiencies could be remedied in the near future. Jasso-Rodriguez also argues that the juvenile court violated his due

process rights by failing to provide adequate notice of an alleged parental deficiency. Substantial evidence supports the relevant findings and Jasso-Rodriguez fails to demonstrate a due process violation. We affirm.

## FACTS

E.E. was born on June 18, 2014. At the time, Jerry Jasso-Rodriguez had served about two months of his 66-month sentence for conspiracy to distribute methamphetamine and felon in possession of a firearm. Jasso-Rodriguez was incarcerated in a federal prison in Victorville, California, and did not learn of E.E.'s birth until several months later. Jasso-Rodriguez had a brief relationship with E.E.'s mother, Michaela Anderson, in late 2013, while he was separated from his wife Janishay Bernal, and did not know Anderson had become pregnant.

Jasso-Rodriguez is the father of five other children, including three children with Bernal. Jasso-Rodriguez acknowledged that at the time of his arrest for the current offenses, he was dealing drugs to support himself and had been abusing prescription pain killers.

Law enforcement officers took E.E. into protective custody because of the mother's substance abuse problems, and the Department filed a dependency petition on September 25, 2014.[1] E.E., who was about three months old at the time, has remained in the same foster home since then. E.E. was about 20 months old at the time of the termination trial in March 2016.

---

[1] Anderson later relinquished her parental rights and is not a party to this appeal.

Jasso-Rodriguez established paternity in February 2015 and in April 2015, agreed to a dependency order under RCW 13.34.030(c) (no parent capable of caring for the child). The disposition order required Jasso-Rodriguez to participate in parenting classes, "if offered in [the] father's prison."[2] Noting that Jasso-Rodriguez was incarcerated in California and that E.E. was an infant, the order also provided that "[v]isitation will be addressed when realistic. . . . However, the [Department] will make efforts to facilitate telephone contact, the exchange of cards, letters & gifts."[3] Subsequent dependency review orders in June and November 2015 included similar provisions regarding parenting classes and the facilitation of contact. The June 2015 dependency review order also directed Jasso-Rodriguez to participate in drug and alcohol related assessments, treatment, and relapse prevention services that were available while incarcerated. The Department filed a termination petition on July 31, 2015.

At the termination trial, Jasso-Rodriguez testified that because of the restrictions at the maximum security prison in Victorville, he was allowed to participate in only one program at a time, for about one to one and a half hours per day. At the time he learned about E.E., Jasso-Rodriguez was enrolled in a general education development (GED) course. Jasso-Rodriguez continued to participate in the GED program until he became eligible for the parenting program in January 2016.

---

[2] Exhibit (Ex.) 8 at 8.

[3] Ex. 8 at 9.

Jasso-Rodriguez began the parenting class in January or February 2016, but attended only three sessions. In early March, approximately one week before the termination trial, he was transferred to a federal correctional facility in Sheridan, Oregon, where he was accepted into a federal prison substance abuse program. The minimum time needed to complete the substance abuse program was about nine months.

Jasso-Rodriguez acknowledged that he had frequent contact with Sharon Cremin, E.E.'s social worker, and the guardian ad litem (GAL) through email, letters, and telephone calls. Cremin provided him with updates about E.E. and sent him pictures on two occasions.

Cremin was unable to facilitate telephone contact between Jasso-Rodriguez and E.E. because E.E. was so young and nonverbal. For the same reason, Cremin determined that she could not facilitate written communications between E.E. and Jasso-Rodriguez. On one occasion, very early in the dependency, Jasso-Rodriguez asked whether E.E. could visit him at Victorville, but he understood that was not possible because of his incarceration and the distance involved.

Jasso-Rodriguez's scheduled release date is March 2019. He testified that if he successfully completed the substance abuse program, his sentence might be reduced by twelve to eighteen months, meaning a release date between September 2017 and March 2018.

Jasso-Rodriguez requested that E.E. be placed with a paternal relative. Multiple relatives expressed an interest to the Department in providing placement for E.E. But at

the time of the termination trial, the only family that had completed the application was permanently disqualified.

Anna Krauss, the guardian ad litem, testified that E.E. was "doing great"[4] in her current placement. She testified that the foster parents were satisfying E.E.'s cultural needs and were supportive of maintaining ties with E.E.'s maternal and paternal relatives. Krauss had been in constant contact with Jasso-Rodriguez about his progress with services.

Because Jasso-Rodriguez had not developed or maintained a relationship with E.E., Krauss recommended termination of his parental rights. She testified that given E.E.'s young age, the necessary delay for the completion of Jasso-Rodriguez's sentence would diminish her prospects for early integration into a stable and permanent home. Krauss believed that under the circumstances, E.E. was entitled to permanency as soon as possible and that termination was in her best interest.

At the conclusion of the termination trial, the juvenile court summarized the current circumstances in the following finding of fact:

> The father has been in prison for [E.E.'s] entire life. He has never met her, spoken to her, or established any relationship with her. He did request a visit in California at the prison, but acknowledged to the assigned social worker that that was probably not practical. So at this point the father has had no contact whatsoever with [E.E.], and she is completely unaware that he is her father.[5]

---

[4] Verbatim Report of Proceedings (VRP) at 196.

[5] Findings of Fact (FF) 2.13 at Clerk's Papers (CP) at 40.

After considering the statutory factors applicable to incarcerated parents, the court found that the Department had established by clear, cogent, and convincing evidence each of the six termination factors under RCW 13.34.180(1)(a) through (f) and that termination was in E.E.'s best interest under RCW 13.34.190(1). The court entered extensive findings of fact and conclusions of law.[6]

## DISCUSSION

Parents have fundamental liberty and privacy interests in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995) (citing In re J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993)); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Before terminating parental rights, Washington courts must follow a two-step process.

First, the Department must prove the following six statutory requirements by clear, cogent, and convincing evidence:

(a) The child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed ... from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

---

[6] We granted Jasso-Rodriguez's motion to file two supplemental assignments of error to findings of fact.

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180(1)(a) through (f); see also In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190.

Second, if the Department proves the six termination factors, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests. RCW 13.34.190(1)(b).

"Our role in reviewing a trial court's decision to terminate parental rights is to determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (citing In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1996). Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

An appellate court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her. . . ." In re Welfare of A.W. and M.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

Continuation of the Parent and Child Relationship

On appeal, Jasso-Rodriguez contends that the Department failed to establish by clear, cogent, and convincing evidence under RCW 13.34.180(f) that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." He argues that substantial evidence failed to support the juvenile court's finding that he did not play a meaningful role in E.E.'s life and that the court to failed to properly consider the statutory factors applicable to incarcerated parents.

In 2013, the Legislature amended RCW 13.34.180(1)(f) to add three specific factors that the trial court "shall consider" before terminating the rights of an incarcerated parent:

> [1] whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b);
>
> [2] whether the department or supervising agency made reasonable efforts as defined in this chapter; and
>
> [3] whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

The 2013 amendments also included RCW 13.34.145(5)(b), which set forth a nonexclusive list of factors that the trial court _may_ consider when determining whether an incarcerated parent maintains a "meaningful role" in the child's life and the various barriers that incarcerated parents face when maintaining such a role:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

See In re Parental Rights of K.J.B., 187 Wn.2d 592, 387 P.3d 1072 (2017).

Consideration of the incarceration factors under RCW 13.34.180(f) means "'a weighing or balancing of facts, along with a resolution of that weighing.'" Id., 387 P.3d at 1078 (quoting In re Parental Rights to M.J., 187 Wn. App. 399, 409, 348 P.3d 1265 (2015)). But contrary to Jasso-Rodriguez's repeated assertions, the juvenile court need not enter formal findings of fact to support its consideration. Id., 387 P.3d at 1079. Nonetheless, the court's oral ruling and extensive written findings of fact here establish that the court considered the mandatory statutory incarceration factors before terminating Jasso-Rodriguez's parental rights. "The statute notably does not mandate

that a certain weight be afforded to the incarceration considerations." In re Welfare of E.D., 195 Wn. App. 673, 695, 381 P.3d 1230 (2016), review denied, 187 Wn.2d 1018, 390 P.3d 351 (2017).

Among other things, the juvenile court found that Jasso-Rodriguez had expressed concern for E.E. by establishing paternity; agreeing to the dependency when he was unavailable for placement; asking the social worker and guardian ad litem (GAL) about how E.E. was doing; cooperating with the Department and GAL; asking for a visit early in the proceeding; and requesting visitation and placement with paternal relatives. The court acknowledged that Jasso-Rodriguez had done an "exceptional job"[7] for an incarcerated person in communicating and working with the Department, had responded positively to the Department's efforts in attempting to participate in services, and that "[c]onsistent with the limitations of his incarceration, he has made a sincere effort to maintain that communication."[8] The court also considered information from individuals in a reasonable position to assist the court and whether the continued involvement of the parent was in the child's best interest. See, RCW 13.34.145(5)(b)(iv), (vi).

The court's findings also reflect consideration of the barriers and limitations that Jasso-Rodriguez faced in developing a meaningful relationship with E.E., beginning with his delay in learning about E.E.'s birth and his ability to establish paternity. The court clearly recognized that incarceration in a maximum security facility resulted in

---

[7] FF 2.25 CP at 42.

[8] Id.

restrictions on Jasso-Rodriguez's ability to participate in services and in legal proceedings. The court expressly noted that Jasso-Rodriguez was able "to participate somewhat" by telephone in the termination trial, but that the record did not indicate whether, or to what degree, he had been able to participate in other court proceedings, including foster care planning meetings.[9] See, RCW 13.34.145(5)(b)(v). But the record also demonstrated that Jasso-Rodriguez had access to the court-ordered services, was able to use the telephone, email, and mail with some restrictions, and had access to his attorney, the social worker, and the GAL.

Jasso-Rodriguez contends that the Department's failure to comply with the dependency review hearing orders, which required the Department to "make efforts to facilitate telephone contact and the exchange of cards and letters and pictures,"[10] created the primary barrier that prevented him from developing a meaningful relationship with E.E. He argues the fact that E.E. was a nonverbal infant does not excuse the Department's failure to comply.

The juvenile court acknowledged that the dependency review orders required the Department to facilitate contact and that "the Department could have taken more affirmative efforts to facilitate this."[11] Jasso-Rodriguez acknowledged that he had access to the telephone and email in prison, with some limitations, and that he had regular and frequent contact with his other children. Jasso-Rodriguez also repeatedly asked the

_____

[9] FF 2.29, CP at 42.

[10] Ex. 10 at 10.

[11] FF 2.24, CP 42.

-11-

Department to make arrangements for his relatives to visit E.E. Under the circumstances, the record provides no support for Jasso-Rodriguez's claim on appeal that he did not know he could attempt to arrange contact with E.E.

In this context, the court also considered what more the Department could have done to facilitate a relationship between Jasso-Rodriguez and E.E. under the particular circumstances here:

> [E.E.] is now only 20 months old, and was three months old when she went into placement. She does not know [Jasso-Rodriguez] because he has been unavailable to form a relationship with her due to his actions of committing federal felony offenses resulting in his being incarcerated in California. Even if an occasional visit to him in person in prison could have been worked out, it would not have assisted a child of this age in developing a meaningful relationship from her point of view, and this is really about the child's meaningful relationship. The same is true for a child of this age for telephone, Skype, email, or written contact. Certainly she could not respond to written contact. Someone could have read something to her, but the ability of a child at this age to understand who is communicating with her, that communication is even happening during most of this time, would be very limited, if possible at all. Therefore, the Court does not find that there are other things the Department could have done to help the child create a meaningful relationship with the father.[12]

Substantial evidence supports this finding.

"'Imprisonment alone does not necessarily justify the termination of parental rights. But the parent's resulting inability to perform his or her parental obligations is certainly relevant to the child's welfare.'" In re E.D., 195 Wn. App. at 690 (quoting In re Dependency of J.W., 90 Wn. App. 417, 426, 953 P.2d 104 (1998)). In considering an incarcerated parent's ability to maintain a meaningful role in a child's life, the court need

---

[12] FF 2.26 at CP 27.

not "disregard the negative effects that incarceration may have on a delicate parent-child relationship . . . [or] ignore the child's need for timely permanency." In re E.D., 195 Wn. App. at 695.

The juvenile court found that E.E. had been in the same foster home for 17 months, the only stable home she has ever known, and that she could not be integrated into a permanent home until Jasso-Rodriguez's rights are terminated. The court also thoroughly considered the statutory incarceration factors: whether Jasso-Rodriguez played a meaningful role, whether the Department made reasonable efforts, and whether particular barriers existed. Substantial evidence, including the length and location of Jasso-Rodriguez's sentence, the circumstances of E.E.'s birth, her age, and the length of the dependency, supports the finding that Jasso-Rodriguez did not play a meaningful role in E.E.'s life and the determination that continuation of the parent-child relationship clearly diminished E.E.'s prospects for early integration into a stable and permanent home. RCW 13.34.180(1)(f).

Necessary Services

Under RCW 13.34.180(1)(d), the Department must prove by clear, cogent, and convincing evidence that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." A service is necessary within the meaning of this provision "if it is needed to address a condition that precludes reunification of the parent and child." In re Dependency of D.L.B., 188 Wn. App. 905, 920, 355 P.3d 345 (2015), aff'd, 186 Wn.2d 103, 376 P.3d 1099 (2016) (citing In re Welfare of C.S., 168

Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). The court may consider "any service received, from whatever source, bearing on the potential correction of parental deficiencies." In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004) (citing In re Dependency of C.T., 54 Wn. App. 490, 496-97, 798 P.3d 1170 (1990)).

Jasso-Rodriguez contends that the Department failed to establish this requirement because it relied only on the services available in prison. He argues that because he was ineligible to participate in more than one service at a time under the prison rules at Victorville, the Department should have investigated whether outside providers could have offered parenting classes or drug and alcohol assessment to him at prison while he studied for his GED.

The dependency disposition and review orders required Jasso-Rodriguez to take parenting classes and a drug and alcohol assessment while he was incarcerated and eligible. At Victorville, Jasso-Rodriguez did not become eligible for additional classes or services until he finished his GED, which did not occur until January 2016. After starting parenting classes, Jasso-Rodriguez then transferred to another facility, where he was eligible to begin a drug treatment program at the time of the termination trial.

The record shows that the necessary services were available to Jasso-Rodriguez in prison and that the Department communicated regularly with him about his participation in those services. Jasso-Rodriguez has not identified any authority imposing on the Department an obligation to search for outside providers for the same services.

Moreover, at the time of the termination trial, Jasso-Rodriguez still had three years to serve on his sentence. He testified that if he successfully completed the drug treatment program, which he had not yet started, he might receive a 12 to 18 month reduction in his sentence. But such a reduction still meant another 18 months before he could be released. Jasso-Rodriguez has not identified any services that would have provided him with the ability to parent within the foreseeable future.

Substantial evidence supports the juvenile court's determination that the Department offered all necessary services capable of correcting parental deficiencies.

Jasso-Rodriguez challenges the court's finding that he chose to "defer" taking the parenting class at Victorville in order to complete his GED.[13] He relies primarily on his own testimony that enrollment in the GED was "a mandatory thing."[14] But there was other testimony suggesting that Jasso-Rodriguez and his prison counselor had made a voluntary decision to concentrate on completion of the GED before pursuing other classes. Moreover, the court found that given the length of his sentence, "there was no particular downside" for Jasso-Rodriguez to complete the GED before taking the other court-ordered classes.[15] Jasso-Rodriguez fails to demonstrate any material error.

Likelihood that Conditions Would be Remedied in the Near Future

Jasso-Rodriguez challenges the juvenile court's determination under RCW 13.34.180(1)(e) that "there is little likelihood that conditions will be remedied so that the

---

[13] FF 2.15 at CP 25.

[14] VRP at 47.

[15] FF 2.15 at CP 40.

child can be returned to the parent in the near future." He argues that his willingness to enroll in the substance abuse treatment program and comply with the other court-ordered conditions demonstrates that the identified deficiencies can be remedied in the near future.

What constitutes the "near future" is determined from the child's point of view and depends on the age of the child and the circumstances of the child's placement. In re Dependency of T.L.G., 126 Wn. App. 181, 205, 108 P.3d 156 (2005). The "near future" for very young children such as E.E. generally involves no more than a few months. See, e.g., In re Dependency of A.W., 53 Wn. App. 22, 765 P.2d 307 (1988) (one year not within foreseeable future of three year old); In re Dependency of P.A.D., 58 Wn. App. 18, 792 P.2d 159 (1990) (six months not within near future of 15 months old). "[W]hat is perhaps eventually possible for the parent must yield to the child's present need for stability and permanence." In re Dependency of T.R., 108 Wn. App. 149, 166, 29 P.3d 1275 (2001).

At the time of the termination trial, Jasso-Rodriguez's release date was still three years away. Even if he successfully completed the drug treatment program that he had not yet started and received the 12-18 month reduction in his sentence, his earliest release date was still 18 months in the future. E.E. was 20 months old and had spent 17 months of her life in the same foster home. Under the circumstances, there was no likelihood that conditions would be remedied to permit E.E.'s return in the near future.

Jasso-Rodriguez again asserts that the Department's failure to facilitate contacts with E.E. resulted in his failure to develop a meaningful relationship. But for the reasons

set forth above, substantial evidence supports the juvenile court's determination that Jasso-Rodriguez did not play a meaningful role in E.E.'s life and that under the circumstances, there was little the Department could have done to facilitate a meaningful relationship.

Best Interests of the Child

We accord the trial court broad discretion in determining whether termination is in the child's best interests. In re Dependency of J.A.F., 168 Wn. App. 653, 670, 278 P.3d 673 (2012). This determination necessarily rests on the specific facts of each case. In re Welfare of M.R.H. and J.D.F., 145 Wn. App. 10, 28, 188 P.3d 510 (2008).

Here, the evidence established that Jasso-Rodriguez had no meaningful relationship with E.E. and had never had any direct contact with her. E.E. has no understanding of her father and has not developed any bonds with him. Because of the circumstances of Jasso-Rodriguez's incarceration and the uncertainty about the ultimate length of his sentence, there is no reasonable likelihood that Jasso-Rodriguez can develop any meaningful relationship with E.E. within the near future. The GAL testified that E.E. was doing well in the current placement, that she was entitled to permanency as soon as possible, and that the delay necessary for Jasso-Rodriguez to complete his sentence would diminish E.E.'s prospects for integration into a stable and permanent home.

Jasso-Rodriguez argues that his continued involvement is in E.E.'s best interest because it will foster her cultural and familial needs. He contends that termination will

likely sever all relationships between E.E. and her paternal family members. The record fails to support this claim.

E.E. spends time with her foster brothers, who are Hispanic-Filipino. Her foster parents are working with E.E. in Spanish, including reading to her and teaching her a bit of Spanish. The GAL testified that the foster parents are "totally supportive" of E.E. maintaining ties with both her maternal and paternal relatives "as long as it's a good situation for [E.E.]."[16] Although there have been some delays and disputes about how many relatives should visit E.E. at a time, E.E.'s paternal relatives have been able to visit her multiple times.

Substantial evidence supports the court's determination that termination is in E.E.'s best interest.

Domestic Violence

Jasso-Rodriguez contends that the juvenile court denied him due process when it failed to notify him that his history of domestic violence could form the basis for termination of his parental rights. See, In re Dependency of A.M.M., 182 Wn. App. 776, 332 P.3d 500 (2014) (termination order relying on parental deficiency not identified in the dependency or termination petitions violated due process). But the court expressly found that it "cannot find [the history of domestic violence] a basis for termination."[17]

The evidence of Jasso-Rodriguez's domestic violence history was admitted without objection. The fact that several of the court's findings refer to that evidence

---

[16] VRP at 197.

[17] FF 2.33.

provides no support for Jasso-Rodriguez's claim that the court relied on his domestic violence history. Jasso-Rodriguez fails to demonstrate a due process violation.

Futility Doctrine

Jasso-Rodriguez contends that the legislature intended to discard the "futility doctrine"[18] when it amended the termination statute to include specific considerations for incarcerated parents. See, In the Matter of the Parental Rights to K.M.M., 186 Wn.2d 466, 483, 379 P.3d 75 (2016) ("The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided") (citing In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)). But because this conclusory contention is raised for the first time in a reply brief and is unsupported by adequate briefing, we decline to consider it.

We affirm the termination order.

_____Spearman, J._____

WE CONCUR:

_____Leach, J._____   _____Appelwick, J._____

---

[18] Reply Brief at 17.