# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of N.A., | ) ) ) | No. 76420-9-I |
| A Minor Child. | ) ) ) | (Consolidated with No. 76494-2-I, No. 76520-5-I, & No. 76521-3-I) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | DIVISION ONE |
| Respondent. | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| John Ackah, | ) ) ) | |
| Appellant, | ) ) ) | |
| Druche Mason, | ) ) ) | |
| Appellant. | ) ) ) | FILED: January 22, 2018 |

LEACH, J. — John Ackah and Druche Mason appeal from the order denying their guardianship petition and terminating their parental rights to their son, N.A. But the parents have failed to demonstrate the trial court applied the wrong standard of proof in rejecting their guardianship petition. The record also shows the court considered all statutory factors applicable to incarcerated parents when terminating Ackah's parental rights. And because both parents expressly conceded the State

had established three of the statutory termination factors, the court's failure to enter corresponding findings of fact does not warrant reversal or remand. We affirm.

FACTS

Ackah and Mason are the parents of N.A., who was born on September 10, 2014. At the time of N.A.'s birth, Mason was 17 years old and a dependent youth. Ackah was incarcerated. Renee Harris is N.A.'s paternal grandmother. After N.A.'s birth, police detained Mason on outstanding warrants involving theft and possession of cocaine. The court then sent her to Echo Glen Children's Center.

In December 2014, the court found N.A. dependent as to Mason. The dispositional order required Mason to participate in a drug and alcohol evaluation and to take parenting classes.

While at Echo Glen, Mason participated in chemical dependency and mental health services. She made some progress but needed to continue with outpatient treatment upon release. The Department of Social and Health Services (Department) also arranged for Mason to visit with N.A. while she was at Echo Glen.

When Mason left Echo Glen in April 2015, the Department placed her into foster care. A short time later, Mason left the placement and was "on the run" until September 2015. Upon her return, the Department placed Mason in Cocoon House, a transitional living facility for youth. It provides assistance for employment and job

skills, housing, education, and recreation. Mental health and drug and alcohol services are also available. The Department made arrangements for Mason to visit with N.A. while she was at Cocoon House, but Mason missed multiple visits.

Mason participated in some services at Cocoon House, but she soon began missing sessions and violating program rules. In December 2015, the Cocoon House staff asked Mason to leave.

After leaving Cocoon House, Mason generally refused the Department's placement attempts. Mason aged out of the foster care program. The court dismissed her dependency in March 2016.

After March 2016, Mason had only intermittent contact with the Department. In late 2016, Mason contacted a Department social worker to ask about visiting N.A. Mason visited N.A. twice but did not continue the contacts.

At the termination trial, Mason testified that she would be comfortable with N.A. staying with Harris until she was able to care for him. Mason estimated that she needed five or six months to get ready. She planned to use this time to

> get in school, get a job, get myself stable, you know, for—I won't have to do stuff, whatever I was doing before, so, being—staying out of trouble like I'd be at my sister's house.

Although he was incarcerated, Ackah attended N.A.'s shelter care hearing on September 12, 2014, two days after his birth. Ackah was released from jail in

October 2014 and remained free for several months. Ackah acknowledged that he did not attempt to contact the Department during this period to ask about N.A. because he believed his paternity was "questionable."

Ackah returned to jail in February 2015. After he pleaded guilty to multiple offenses, including theft and unlawful possession of a firearm, the court imposed a 57-month sentence. Ackah remained incarcerated at the time of the termination trial in January 2017. He testified that he was currently scheduled to begin work release in October 2017 and that his early release date was April 2018.

The court found N.A. dependent as to Ackah in February 2015. The dispositional order required Ackah to participate in dialectical behavior therapy (DBT), attend age appropriate parenting classes, and cooperate with the Department of Corrections (DOC) and the prosecutor's office in establishing paternity. Among other things, the court also directed the Department to investigate Harris as a placement option if Ackah established paternity.

Ackah did not initially notify the Department of his incarceration. Kristin Mayer, N.A.'s social worker, did not learn that Ackah was incarcerated in the King County Correctional Facility until about May 2015. Mayer visited Ackah and determined that none of the court-ordered services were available to jail inmates.

After Ackah spent several months in the King County Correctional Facility, DOC sent him to the Washington Corrections Center in Shelton for classification. In February 2016, DOC moved Ackah to the Coyote Ridge Corrections Center, a medium security facility near Pasco. In July 2015, when Ackah's security classification changed, DOC transferred him to the Larch Corrections Center, a minimum security facility near Vancouver. Court-ordered services were not available at the Coyote Ridge or Larch facilities. "Thinking for Change," a service with elements of DBT, was available at both Coyote Ridge and Larch. At the time of trial in January 2017, DOC was in the process of reclassifying Ackah to a medium security facility after he committed several infractions.

During the course of the dependency, Harris contacted the Department several times, asking the Department to consider her as a placement resource. At the time, Harris lived in Las Vegas. In November 2015, the Department received confirmation that Ackah was N.A.'s biological father. It then made a request under the Interstate Compact on the Placement of Children (ICPC) that Nevada conduct a home study.

Jennifer Jones, an experienced Nevada family services employee, conducted the home study. Jones's study raised "numerous concerns" about Harris's ability to care for N.A. Jones found that Harris sometimes gave very vague and inconsistent

answers to questions. Harris was unable to demonstrate any current income or a meaningful future ability to support N.A. Jones was also concerned about Harris's ability to track time, noting that she would need to be able to respond to N.A.'s ongoing medical needs, as well as "communicate with two different states" after placement under the ICPC. Jones concluded that Harris would be unable to meet N.A.'s needs and recommended that she be denied placement for N.A. Harris moved to Washington in the summer of 2016 but was unable to complete a new home study in Washington.

In February 2016, the Department petitioned for termination of both parents' parental rights.

Ackah filed a motion requesting in-person visits with N.A. On March 23, 2016, the court determined that visitation with Ackah was in N.A.'s best interest but found that in-person visits were not feasible because of Ackah's incarceration at Coyote Ridge. The court ordered Ackah to have a minimum of two monthly visits with N.A. via video and two by telephone. The court permitted Ackah to send N.A. letters and pictures, and he later sent N.A. a number of letters and drawings.

Department efforts to set up video visits between Ackah and N.A. were unsuccessful. On August 24, 2016, the court granted Ackah's motion to compel in part and ordered the Department to comply with the court's prior order requiring video

and telephone visits. The court noted that the assigned social worker's lack of training had apparently prevented the Department from arranging the visits. The court denied Ackah's request for in-person visits because of the travel distance to the Larch Corrections Center.

The Department was unable to arrange any video or telephone visits. Ackah had one in-person visit with N.A. in the King County Correctional Facility while awaiting trial.

In July 2016, Ackah petitioned the court to appoint Harris as N.A.'s guardian. Mason filed a written agreement with the petition.

The trial court conducted a nine-day combined termination and guardianship trial in January 2017. Harris testified that she had participated in a home study with a provider that the defense had selected. But Harris submitted no evidence about the study results. The court rejected much of Harris's testimony as not credible.

Ackah testified that he would need 24 months after his release before he would be able to independently care for N.A. He planned to use this time to arrange for "Employment, housing, transportation, show my credentials and everything's updated, uh, drug-free." Ackah expected to find regular employment, but he also expected to start an independent recording label and a private jet airline company to finance his plan for N.A. to become a professional basketball player. Ackah did not

believe the transition from N.A.'s current foster placement to placement with Harris and then to living with Ackah would have any serious negative effect on N.A.

The court rejected guardianship as not in N.A.'s best interest, finding that Harris "is not qualified, appropriate and capable of performing the duties of guardian." The court entered the following supporting findings of fact:

> 2.4.1 Ms. Harris's inconsistent statements regarding her relationship with the child's mother Druche Mason, her inconsistent statements regarding her son's deficiencies and expected role in the child's life, and lack of candor with this court pose an untenable risk that she will not follow through with her assurances to protect the child with clear boundaries for the parents.
>
> 2.4.2 Ms. Harris' inability to clearly communicate with professionals involved in [N.A.'s] case, her inability to set and keep appointments with these professionals, and her inability to take responsibility for her part in miscommunications and missed appointments creates undue risk that she will not be able to consistently follow-through with the therapeutic needs of [N.A.], which would adversely impact the progress he has made in his development. This inability was demonstrated by the evidence of her missing appointments and calling or showing up repeatedly without an appointment.
>
> 2.4.3 Professionals working with [N.A.] and the CASA assigned to the case shortly after the child's birth indicate the importance of a stability and routine to his continued progress. The evidence before the court does not demonstrate that Ms. Harris can provide that required routine and stability. She has failed a home study in Nevada and been unable to navigate the process of submitting to a new home study through the Division of Licensed Resources at DSHS in Washington. She testified to participating in an

-8-

investigation of her home with a provider arranged by defense but has provided no evidence of the conclusions drawn from that investigation. The Nevada home study professional, Jennifer Jones, described Ms. Harris' manner and responses to questions as "vague." This was consistent with the court's observations of Ms. Harris in court. She often did not answer questions, and instead began talking about something else. She gave inconsistent testimony on significant issues. The court did not find her testimony credible.

2.5 Based on the admissions of the parents, the court finds that the elements required by 13.36.040(2)(c)(i)-(vi) have been established by a preponderance of the evidence. However, a preponderance of the evidence does not support the required finding under RCW 13.36.040(2)(a) that it is in [N.A.'s] best interest to establish a guardianship, rather than to terminate the parent-child relationship and proceed with adoption. . . .

2.5.1 [N.A.] does not have a relationship with Ms. Harris or with his extended family. While it is clear that Ms. Harris and the father wish for him to have connection to his biological family, there is no evidence before the court from which to conclude that severing the legal relationship between [N.A.] and his parents and possible relationships with extended family would have deleterious effect on the child.

2.5.2 [N.A.'s] progress in addressing his developmental deficits would be impacted by a move from his current stable placement, and it is uncertain whether that progress would be regained. If moved, it is uncertain whether he could attach to a new primary caregiver since the only mother figure he has known is his current foster mother. The risk to [N.A.'s] continued developmental progress from disrupting his current stable home is balanced by the speculative benefits he would gain from furthering a relationship with his parents, paternal grandmother and any extended family he would be likely to come to know.

2.5.3 It is not in [N.A.'s] best interest to move him from the only home he has known to the home of his paternal

grandmother in a guardianship, where the paternal grandmother has not demonstrated that she will be adequately protective of the child. Her lack of candor with this court regarding her relationship with Ms. Mason, regarding her current occupation, and relationships does not give this court confidence that she will place this child's needs above her own if she were to be appointed as his guardian.

The court found the Department had proved the statutory termination factors by clear, cogent, and convincing evidence and that termination was in N.A.'s best interest. The court entered the following findings relevant to the arguments on appeal:

2.7.1 The court considers near future from the position of the child. [N.A.] is just 28 months old. He has never lived with his mother or father. CASA testimony and the testimony of the social workers demonstrate that, for a child of this young age, the near future is measured in weeks or several months. The father was realistic in his testimony about when he believes he would be ready to parent [N.A.], approximately 24 months after his release. In that case he would be unavailable to parent [N.A.] until at the earliest April 2020. Even if Ms. Mason were to fully engage in services today, she would need well over 6 months in order to demonstrate stability in her own life, ensure sobriety and address her deficiencies related to mental health that would position her to safely parent this child, and there is no reason to believe Ms. Mason will so engage. The time it would take before either parent could safely parent [N.A.] is well beyond his near future.

2.7.2 The father's plans for how he would ensure [N.A.] was provided a safe and stable home in his care are hopeful, but not realistic. While the father states that he would work a regular 8-5 job to provide for his son, he also states a number of fanciful plans that are not well reasoned that

-10-

appear to be more his focus than working on a solid plan to establish his own stability on his release, much less his son's. He hopes to own an[ ] independent recording label and a private jet airline company, to support his plans for [N.A.] to be an NBA player.

2.8 Continuation of the parent child relationship clearly diminishes this child's prospects for early integration into a permanent and stable home.

2.8.1 [N.A.] has prospects for adoption and cannot be adopted while his mother and father's rights are intact. For the reasons stated above, guardianship is not an appropriate permanent plan for this child and this young child is in need of permanence now.

2.8.2 Even if his current prospects for adoption became unavailable, there are additional adoptive resources that would be available if the legal relationship were severed between [N.A.] and his parents that would allow for his early integration into an adoptive home.

2.8.1 The court has considered the factors set forth in 13.34.145 and does not believe that the father has a meaningful relationship with his son. The father has demonstrated his concern for his son through his letters and requests for phone contact or visits at the facility. However, it is concerning that prior to his incarceration he expressed no interest in [N.A.] and did not involve himself in the case. While the Department could have done more to assist the father in having consistent contact with his son, given the child's young age, additional video visits and phone calls would not likely have changed the nature of their relationship significantly. There were limitations to the father's ability to engage in services once he was incarcerated, and he did participate in the "Thinking for Change" program once he reached the Larch Correctional facility, however his own actions in violating DOC rules, led to his reclassification to a more secure facility and need to leave Larch for reassignment. Although the father has made efforts to engage in the case and be a presence in his

son's life after he became incarcerated, continued involvement is not in the best interest of [N.A.].

. . . .

2.9.1 There is no current relationship between Mr. Ackah or Ms. Mason, and their son [N.A.]. That lack of relationship for the father is due in part to his criminal behavior leading to his incarceration, due in part to the inability of the Department to timely navigate the visitation program rules at the DOC facility before the father's actions led to his reassignment, and in part due to the circumstantial barrier of incarceration itself. Ms. Mason has not maintained consistent visitation with her son and has no current relationship. It is not in this child's best interest to remain in legal limbo until his father is available to parent or his mother is ready to place his needs above her own and consistently participate in his life.

## ANALYSIS

### Standard of Review

Parents have fundamental liberty and privacy interests in the care and custody of their children.[1] Before terminating parental rights, Washington courts must follow a two-step process.

First, the Department must prove the following six statutory requirements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

---

[1] In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995) (citing In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993)); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .[2]

Second, if the Department proves the six termination factors, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests.[3]

An appellate court reviews a termination decision "to determine whether substantial evidence supports the trial courts findings of fact by clear, cogent, and

---

[2] RCW 13.34.180(1)(a)-(f); see also In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190.
[3] RCW 13.34.190(1)(b).

-13-

convincing evidence."[4]   Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable.[5]

We necessarily defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.[6]  Our deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her."[7]

Before terminating the rights of an incarcerated parent, RCW 13.34.180(1)(f) provides that the trial court "shall consider" three specific factors:   (1) "whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b);" (2) "whether the department or supervising agency made reasonable efforts as defined in this chapter; and" (3) "whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child."

RCW 13.34.145(5)(b) sets forth the following nonexclusive list of factors that the trial court "may" consider when determining whether an incarcerated parent

---

[4] In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (citing In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999)).
[5] In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).
[6] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).
[7] In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

maintains a "meaningful role" in the child's life and the various barriers that incarcerated parents face when maintaining such a role:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
>
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
>
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
>
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
>
> (v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and
>
> (vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.[8]

Consideration of the incarceration factors under RCW 13.34.180(f) means "'a weighing or balancing of facts, along with a resolution of that weighing.'"[9] While the

---

[8] See also In re Parental Rights to K.J.B., 187 Wn.2d 592, 598-603, 387 P.3d 1072 (2017).

record must demonstrate the court's consideration of the relevant factors, the court need not enter formal findings of fact to support its decision.[10]

Statutory Incarceration Factors

Ackah concedes that the court considered the "meaningful role" factor and the associated nonexclusive criteria set forth in RCW 13.34.145(5)(b). But he claims the court failed to consider the "reasonable efforts" and "particular barriers" factors. He argues that as a result, the Department failed to satisfy its burden of proving RCW 13.34.180(1)(f) ("continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home"). The record does not support these arguments.

As Ackah acknowledges, the court considered the factors set forth in RCW 13.34.145 and found that Ackah did not have a meaningful relationship with N.A. The court expressly recognized that after his incarceration, Ackah had demonstrated concern for N.A. by sending him letters and requesting telephone contact and visits. The court also found that the Department could have done more to assist Ackah in establishing consistent contact with N.A.

---

[9] K.J.B., 187 Wn.2d at 603 (quoting In re Parental Rights to M.J., 187 Wn. App. 399, 409, 348 P.3d 1265 (2015)).
[10] K.J.B., 187 Wn.2d at 603-04.

But the court also weighed the fact that Department social workers made ongoing efforts to stay in contact with Ackah as he moved through a series of correctional facilities and assist him in determining the availability of relevant services. Unfortunately, DOC provided only very limited services. The court further considered that in the several months when he was out of custody after N.A.'s birth, Ackah made no effort to pursue paternity or establish any relationship with N.A. The court recognized that N.A.'s young age hampered Ackah's attempts at communication. As a result, "additional video visits and phone calls would not likely have changed the nature of their relationship significantly."

"'Imprisonment alone does not necessarily justify the termination of parental rights. But the parent's resulting inability to perform his or her parental obligations is certainly relevant to the child's welfare.'"[11] When considering an incarcerated parent's ability to maintain a meaningful role in a child's life, the court need not "disregard the negative effects that incarceration may have on a delicate parent-child relationship [or] ignore the child's need for timely permanency."[12]

---

[11] In re Parental Rights to E.D., 195 Wn. App. 673, 690, 381 P.3d 1230 (2016) (quoting In re Dependency of J.W., 90 Wn. App. 417, 426, 953 P.2d 104 (1998) (citations omitted))), review denied, 187 Wn.2d 1018 (2017).

[12] E.D., 195 Wn. App. at 695.

The fact that some circumstances were favorable to Ackah does not undermine the court's decision. "The statute notably does not mandate that a certain weight be afforded to the incarceration considerations."[13] Each case necessarily rests "on its own set of facts."[14] Viewed in context, the court's detailed findings clearly addressed all of the mandatory statutory incarceration factors, including not only the "meaningful role" factor, but also the Department's "reasonable efforts" and the "particular barriers" that Ackah faced during his lengthy incarceration. Substantial evidence supports the court's findings.

Guardianship Burden of Proof

For the first time on appeal, Ackah contends the trial court applied the wrong standard of proof when determining that termination, rather than his proposed guardianship, was in N.A.'s best interest. He argues that when the court decides a parent's guardianship petition and a competing termination petition, "due process requires proof, by clear and convincing evidence, that guardianship is clearly contrary to the child's best interests." Mason has adopted Ackah's assignment of error and corresponding argument by reference.[15]

---

[13] E.D., 195 Wn. App. at 695.
[14] E.D., 195 Wn. App. at 695.
[15] See RAP 10.1(g)(2).

An appellate court generally will not consider issues raised for the first time on appeal unless the claimed error is a "manifest error affecting a constitutional right."[16] To satisfy the requirements of RAP 2.5(a), an appellant must "'identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial.'"[17]

Ackah cites RAP 2.5(a) in his opening brief but provides no meaningful legal argument to demonstrate a manifest constitutional error. To the extent Ackah attempts to rectify this omission in his reply brief, the effort comes too late.[18] Accordingly, we decline to address the issue.

Failure To Enter Findings

Mason contends the trial court erred in failing to enter written findings of fact that the State proved the first three statutory termination elements by clear, cogent, and convincing evidence: (1) "child has been found to be a dependent child," (2) "court has entered a dispositional order," and (3) "child has been removed . . . from

---

[16] RAP 2.5(a); see generally State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009).

[17] O'Hara, 167 Wn.2d at 98 (alteration in original) (quoting State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)).

[18] See Axess Int'l Ltd. v. Intercargo Ins. Co., 107 Wn. App. 713, 719, 30 P.3d 1 (2001) ("An issue raised and argued for the first time in a reply brief is raised too late").

the custody of the parent for . . . at least six months."[19]  Mason argues that the termination order is therefore invalid on its face and must be reversed.  In the alternative, Mason asks the court to remand for entry of the omitted findings.  Ackah has adopted the assignment of error and corresponding arguments by reference.

The sufficiency of the evidence establishing the first three termination elements was unchallenged at trial.  Moreover, in her answer to the termination petition, Mason expressly admitted that the Department had established the first three statutory elements.  During closing argument, counsel for Ackah conceded that the Department has established the first three elements:  "We do concede the first three elements: there's a dependency; there's a dispo; [N.A.] has been out of the home for six months."  On appeal, neither Mason nor Ackah challenges the sufficiency of the evidence in the record to establish the first three statutory termination elements.

Under these circumstances, remand for entry of the findings would be a useless act.  We decline to do so.[20]

---

[19] RCW 13.34.180(1)(a)-(c).

[20] See State v. Mecca Twin Theater & Film Exch., Inc., 82 Wn.2d 87, 92-93, 507 P.2d 1165 (1973) (where essential facts were not in dispute, remand for findings would be a useless act).

No. 76420-9-I / 21

Ackah's motion to modify is denied;[21] the trial court order denying guardianship and terminating parental rights is affirmed.

_Leach, J._

WE CONCUR:

_Spearman, J._

_Cox, J._

2018 JAN 22 AM 9: 28
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

---

[21] Ackah has moved to modify the court administrator/clerk's December 14, 2017, ruling about the case title. Because the court administrator/clerk's ruling is consistent with RAP 3.4 and the Court of Appeals General Court Order dated May 25, 2017, the motion to modify is denied. Gen. Order of Division I, In re Changes to Case Title (Wash. Ct. App. May 25, 2017), http://www.courts.wa.gov/appellate_trial_courts/.

-21-