IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>K.S.T. | No. 84393-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — C.T. appeals the trial court's termination of his parental rights as to four-year-old K.S.T. From the time of K.S.T.'s birth until his incarceration, C.T. was addicted to substances. Since being released from total incarceration on a graduated reentry program, C.T. has made significant progress in remedying his parental deficiencies. However, substantial evidence supports the trial court's findings of fact that C.T. will not be ready for K.S.T. to return to his custody in her near future. These findings support the court's legal conclusion that termination of the parent-child relationship was proper. K.S.T. has waited four years for the permanency of adoption by her long-term foster family, and termination is in her best interests. We affirm.

FACTS

When K.S.T. was born in July 2018, she had opiates, amphetamine, and alcohol in her system. K.S.T.'s parents were both unhoused and struggled with substance abuse. After a brief stay in the hospital, K.S.T. began residing with a

foster family where she has remained since. K.S.T. turned four years old during the termination trial.

K.S.T.'s father, C.T., was present at the hospital for her birth and visited during her stay, but stopped contact once K.S.T went to live with her foster family. K.S.T. was found dependent as to her mother in September 2018.[1] In November 2018, the dependency court found K.S.T. dependent as to C.T. by default. The order of dependency required C.T. to establish paternity, to complete parenting, domestic violence, and substance abuse assessments and follow all recommendations, and to complete 90 days of random urinalysis testing. C.T. did not engage with the Department of Children, Youth and Families (Department) at this time.

The following year, in April 2019, C.T. pleaded guilty to multiple counts of burglary and was incarcerated in Walla Walla. Upon his incarceration, C.T. became clean and sober for the first time in many years. He began engaging with the Department, establishing paternity and attempting to engage in services. However, because services were very limited in prison, C.T. could not receive random urinalysis testing, drug and alcohol assessment, or domestic violence assessment. The Department found a provider who would conduct an online parenting evaluation and paid for C.T. to complete several online instructional classes through American Community Corrections Institute.

---

[1] The mother's parental rights were terminated on May 5, 2021. She is not a party to the proceeding below or this appeal.

While still incarcerated, C.T. began 30-minute video visits with K.S.T. in May 2020. C.T. estimated they had about 33 video visits over two years. The parenting evaluator observed a video visit and recommended C.T. continue visits, seek a parenting support group, and participate in parenting classes. These services remained difficult to access due to C.T.'s incarceration and the COVID-19 pandemic restrictions. The Department filed a petition for termination of C.T.'s parental rights in December 2020 and amended the petition in May 2021.

On May 12, 2022, C.T. transferred to the graduated reentry program (GRE), a program that allows him to serve the remainder of his sentence in the community as a step between incarceration and probation. To remain a part of the GRE program, C.T. may not have any felony warrants or misdemeanor detainers issued, and must find employment, participate in programming such as substance abuse or domestic violence treatment, comply with urinalysis testing requirements, and remain substance-free. Despite being in the community, GRE participants are still considered inmates by the Department of Corrections (DOC). As a result, C.T. is subject to electronic home monitoring until his official release date in October 2023. DOC must know his whereabouts at all times, and he cannot go anywhere without permission. C.T.'s schedules must be preplanned and approved a week an advance with little opportunity for flexibility. C.T. lives in sober housing with several other people subject to DOC constraints. His living arrangements are not suitable for, and do not permit, children. While there is

potential for C.T. to transfer to suitable GRE housing that would allow K.S.T., he is new to the program and must gain compliance in certain programming requirements before he would be eligible to move.

After C.T. transitioned to GRE, the Department referred him to several services. He had a substance abuse assessment and was participating in a substance abuse program including group and individual meetings. He was undergoing a domestic violence assessment and had an initial session with a provider called Positive Parenting Program. In addition, C.T. began in-person supervised visits with K.S.T. once per week for three hours each. C.T. rapidly progressed to monitored visits and was transitioning to unsupervised visits three times per week for three hours each.

The termination trial began on June 27, 2022, taking place intermittently over a few weeks. The court heard testimony from witnesses including C.T., social workers, the court appointed special advocate (CASA), the substance abuse counselor, the parenting educator, and K.S.T.'s foster mother. At the end of the trial, the trial court granted the State's petition and terminated C.T.'s parental rights. C.T. appeals.

DISCUSSION

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). To terminate parental rights, the State must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The first

step focuses on the adequacy of the parents, and the second step focuses on the child's best interests. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

First, the State must prove six statutory elements by clear, cogent, and convincing evidence. Matter of B.P. v. H.O., 186 Wn.2d 292, 312, 376 P.3d 350 (2016). These elements are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .; and
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180. Clear, cogent, and convincing evidence exists when the ultimate fact at issue is shown by evidence to be "highly probable." In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.3d 1132 (1995).

Only if the first step is satisfied does the court reach the second step, whether termination is in the best interests of the child. K.N.J., 171 Wn.2d at 577. This step need be proved only by a preponderance of the evidence. A.B., 168 Wn.2d at 911.

Additionally, the State must prove the nonstatutory prerequisite of parental unfitness by clear, cogent and convincing evidence. B.P., 186 Wn.2d at 312-13. To satisfy due process, the State may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question. Id. A trial court's finding that the six statutory prerequisites have been met constitutes an implicit finding of unfitness. Id. at 313.

 "The termination order will be upheld if there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing to support the termination findings." In re Dependency of A.M., 106 Wn. App. 123, 131, 22 P.3d 838 (2001). The trial court's findings of fact will not be disturbed as long as they are supported by substantial evidence in the record. B.P., 186 Wn.2d at 313. "Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise." In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). Where a fact must be shown by clear, cogent, and convincing evidence, substantial evidence must demonstrate that the fact is "highly probable." In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022). This court does not weigh the evidence or the credibility of the witnesses. State v. Saint-Louis, 188 Wn. App. 905, 914, 355 P.3d 345 (2015).

On appeal, C.T. challenges the trial court's findings of fact and conclusions of law on these issues: (1) whether there is little likelihood that conditions will be remedied so that K.S.T. can be returned to C.T. in the near

future (subsection (e) of RCW 13.34.180); (2) whether continuation of the parent and child relationship clearly diminishes K.S.T.'s prospects for early integration into a stable and permanent home (subsection (f)); (3) whether C.T. is unfit to parent; and (4) whether termination is in K.S.T.'s best interests.

I.     Likelihood That Conditions Will Be Remedied

C.T. challenges the court's conclusion under RCW 13.34.180(e) that there is little likelihood conditions will be remedied. He argues that his significant progress "as a human, and a parent" during incarceration and partial confinement is sufficient to undermine any allegations that there is little likelihood that he can remedy his parental defects in the near future. However, while C.T. has made a concerted effort at reunification, substantial evidence in the record supports the court's findings of fact and demonstrates it is "highly probable" that C.T. could not remedy his deficiencies within the short time period set by the court.

RCW 13.34.180(e) requires proof by clear, cogent, and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." This factor focuses on whether parental deficiencies have been remedied. In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001). "What constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." C.B., 134 Wn. App. at 954.

In finding 2.11.18, the trial court determined that K.S.T.'s near future was two months, and C.T. could not meet that timeline:

> Based on [K.S.T.'s] age, needs, and developmental level, her near future is at most two months. To ensure that [C.T.'s] parental deficits had in fact been resolved and not merely temporarily suppressed to avoid a return to prison, the court would need to see a new, sustained pattern of internally driven stability and sobriety. Even if [C.T.] moved into his own home and made stellar progress in his services, it will take at least a year (and likely some months beyond October 2023) for [C.T.] to establish that he had remedied his parental deficits such that [K.S.T.] could be returned to his care.

C.T. assigns error to the portion of finding 2.11.18 estimating "it will take at least a year (and likely some months beyond October 2023)" before K.S.T. could be returned to his care to ensure C.T. had "not merely temporarily suppressed" his parenting deficiencies." But C.T. does not assign error to the portion of finding 2.11.18 that K.S.T.'s "near future" is at most two months,[2] nor does he argue that this timeline is incorrect. Thus, the two-month "near future" is unchallenged, and "unchallenged findings of fact are verities on appeal." In re Est. of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

The remaining question, therefore, is whether substantial evidence shows the high probability that C.T. could not remedy his parental deficiencies within that time period to support the court's determination. See A.M.F., 23 Wn. App. 2d at 141. As to this finding, testimony supports that C.T. would need significantly longer than two months to remedy his parental deficiencies to allow for reunification. First, as long as he is part of the GRE program, until October 2023, C.T. remains subject to DOC authority and has strict requirements for his living

---

[2] Matter of Welfare of E.D., 195 Wn. App. 673, 683, 381 P.3d 1230 (2016) (six months is outside of the near future for an eighteen-month-old); T.R., 108 Wn. App. at 164-65 (one year is beyond the foreseeable future for a six-year-old).

conditions and daily schedule. C.T. must wear an ankle monitor, live in approved housing, find and maintain employment, and inform DOC of his weekly schedule with minimal opportunity for deviation.

At the time of trial, K.S.T. could not visit C.T. at his residence, let alone live with him. C.T.'s community corrections officer testified that C.T. could potentially be eligible to move to child-friendly housing in the next 30 days. Thus, even on the most optimistic schedule, half of K.S.T.'s two-month near future timeline would pass before she could begin overnight visits with C.T. While the trial court found that C.T.'s housing was not a barrier to K.S.T.'s placement with him, considering the short window for reunification, there were other barriers to C.T.'s ability to remedy parental deficiencies and meet K.S.T.'s needs. A Department social worker supervisor estimated that C.T. would need at least six months to a year to be able to meet K.S.T.'s emotional, educational, and health needs. C.T. acknowledged, "there are things that I need to work on that I believe, you know, and that is kind of knowledge of like even, you know, getting up to speed with how her life is." He stated, "I would like to get to know her more, you know, so I can identify more of her characteristics and how she is." C.T. admitted that he was not ready to take K.S.T. on at the time of the termination trial, and he would need to gain an understanding of K.S.T.'s needs and everyday life before he could care for her. On the most aggressive timeline, which was put forward by C.T., he would not be reunified with K.S.T. for 24 weeks.

9

The trial court found that C.T. would require significantly longer than his 24-week estimate for reunification. At the time of trial, C.T. had not yet completed his domestic violence assessment, had only begun his substance abuse treatment, had begun one parenting program, and had not yet satisfied the random urinalysis testing requirement. Moreover, C.T. remained subject to strict DOC requirements. The court expressed the importance of these DOC limitations, particularly with respect to C.T.'s sobriety:

> As an adult, [C.T.] has rarely maintained sobriety or consistent relationships with his three children except when subject to penal constraints. . . .Thus, even if [C.T.] maintained his sobriety through the end of his prison term and otherwise addressed his parental deficits, the fact that he remains subject to the Department of Corrections' authority to return him to prison for "any reason" (RCW 9.94A.733(6)) means that it will only be sometime after October 2023 that this court will be able to with some degree of reasonable assurance assess whether [C.T.] has remedied his parental deficits.[3]

Trial testimony supports the trial court's concern about C.T.'s history of sobriety followed by relapse or abuse of a different substance.

By his own admission, C.T. was clean only two of twenty-two years outside of prison. As a teenager, C.T. tried marijuana. In his twenties, C.T. moved to mushrooms and cocaine "and stuff like that." He also began to drink alcohol to excess and was arrested for DUI in 2003. After the first DUI, C.T. underwent 30 days of inpatient treatment for alcohol abuse. While he stopped drinking, he "was doing other things besides that" after treatment. He began

---

[3] Finding of fact 2.11.15. C.T. challenges the finding that he had a pattern of only remaining sober when "subject to penal restraints."

drinking again in 2008 and had another DUI arrest. C.T. testified that he engaged in additional outpatient alcohol treatment at that time. Upon release from a prison sentence for violation of a no-contact order related to a former partner around 2011, C.T. began using drugs immediately. At some point, C.T. was abusing oxycodone and then received private treatment with Suboxone. He testified to using methamphetamines and heroin. By 2016, he had to close his plumbing business due to heavy drug use. Prior to his arrest shortly after K.S.T.'s birth, C.T. used methamphetamines and heroin daily. He stopped using those drugs the day he was arrested for burglary. C.T. says that he has been clean since then, even though drugs are as easily available in prison as they are outside.

C.T.'s substance abuse history shows periods where he obtained treatment or attained sobriety while incarcerated. After treatment or release from incarceration, C.T. quickly returned to abusing substances. During trial, C.T.'s substance abuse counselor noted the challenge of sobriety without treatment and outside of penal restraints:

> [W]e will have clients who have been incarcerated for five years and when they get out of jail, they struggled with substance use prior, and they are not getting substance use treatment while they are incarcerated, so it is recommended that they engage in some type of treatment services once they are out. . . . when they come out, they are in an open environment and they don't have the coping skills to prevent that substance use.

While he had been clean since the beginning of his incarceration in 2019, C.T. obtained that sobriety without treatment. The severity of his history of addiction placed him at moderate risk of relapse when in the community. At the time of the

11

termination trial, C.T. had only begun substance abuse treatment, which normally requires at least six months. He had not yet started working on relapse prevention.

Several witnesses testified about the importance of C.T.'s history of relapse. The CASA testified that C.T. "is in a situation where there is structure and accountability" but "because of the history that if that accountability and structure is gone, I just—I—it concerns me." His social worker testified that reunification would require "a pattern of behavior for an extended period of time showing sobriety." The Department noted, "he has stated that he has initiated services and also completed services in the past, but he still has the pattern of the behaviors and incarceration after completing said courses in the past." His social worker opined that, to remedy his parental deficiencies, C.T. "needs time to demonstrate behaviors that he is available and can provide these capacities and maintain his presence in the household without demonstrating, you know, substance use and those types of things that led into him being incarcerated." And the CASA testified, "I would like to see something like a year of sober and clean living outside of the jurisdiction . . . of a sober house, or you know kind of living on his own, continuing to attend classes by choice, and staying clean and sober and crime free."

C.T. points to the testimony of the substance abuse counselor, who recommended a six-month outpatient and relapse prevention. But the trial court found the substance abuse counselor's assessment and testimony "unjustifiably

12

biased in favor of minimizing the level of treatment [C.T.] requires."[4] C.T. acknowledges that this credibility determination is not reviewable but nevertheless argues "assuming the court intended to follow the only treatment framework discussed in the record, and not invent its own, the court's criticisms make little sense." However, the theme of multiple witnesses' testimony is that C.T.'s long history of substance abuse and relapse required a significant period of sobriety after release from all DOC constraints. Rather than the level of treatment, the major issue is C.T.'s long-term ability to cope and remain sober outside of strict supervision. As the substance abuse counselor testified, people who have been sober without treatment while incarcerated, such as C.T., have not developed the necessary coping skills.

Based on the testimony, even if C.T. could complete all other services while under DOC authority, assessment of his true ability to remain sober could not begin until his discharge from the DOC GRE program and lifting of all restraints in October 2023. Proof of that sobriety in the community would then require "an extended period of time" or even a year. This timeline provides substantial evidence for the trial court's findings that C.T. would need at least a year—well beyond the unchallenged two-month "near future" for K.S.T.—to remedy his parental deficiencies.

Despite the substantial evidence demonstrating the high probability that C.T. cannot meet K.S.T.'s needs in her near future, C.T. contends the court

---

[4] Finding of fact 2.11.17.

improperly focused on his past history while failing to credit his significant progress that prompted the dependency court to allow him to proceed quickly from supervised to monitored visits, and would soon permit unsupervised visits. Citing C.B., 134 Wn. App. at 953, C.T. argues that this demonstrated success should be sufficient to undermine the court's finding on RCW 13.34.180(e).

In C.B., the parent demonstrated steady improvement over the four-month period between filing of the termination petition and the hearing. 134 Wn. App. at 953. The only issue was "whether her improvement was too late" for reunification within the children's six-month to one-year "near future." Id. at 953-54. The court held that the State could not rely solely on past performance to establish it was highly probable that there was little likelihood the parent would improve enough to be reunited with the children in the near future. Id. The evidence in the record supported the time frame of six months to one year for the children's "near future." Id. at 954. However, the evidence did not support a finding that the parent would require more than a year to satisfy the requirements for reunification. Id. at 957. Despite the mother's past drug use, the State had conceded that she had been following her treatment, and it was "not a situation in which [the mother's] drug use was so extensive as to make it unlikely that she could not remedy it in the near future." Id. at 958. The court in C.B. distinguished T.R., where case workers testified that reunification would require at least an additional year of services, which exceeded the child's "near future." Id. at 959. The court in T.R. noted, "what is perhaps eventually possible for the parent must

yield to the child's present need for stability and permanence." 108 Wn. App. at 166.

Here, as in T.R., substantial evidence showed a high probability that reunification between C.T. and K.S.T. would require more time than K.S.T.'s "near future," a time frame that was unchallenged. C.T. cannot demonstrate remediation of his parental deficiencies within K.S.T.'s two-month near future even with the evidence of his rapid improvement. C.T. acknowledged that he was not ready to care for K.S.T. and that he needed time to learn her behaviors, needs, and routines. Indeed, C.T.'s own reunification plan requires 24 weeks before her return to his custody. This is far beyond K.S.T.'s two-month "near future."

Substantial evidence supports the trial court's findings that C.T.'s deficiencies are unlikely to be remediated in the near future as required to prove RCW 13.34.180(e).

## II.    Early Integration

C.T. argues the trial court erred by failing to meaningfully consider the incarcerated parent factors for early integration in RCW 13.34.145(b). We disagree.

The State must prove by clear, cogent, and convincing evidence "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(f). "The focus of subsection .180(1)(f) is the 'continued effect of the

*legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources.' " Matter of Dependency of A.M.F., 1 Wn.3d 407, 417-18, 526 P.3d 32 (2023) (quoting In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004)). A trial court can find this element satisfied when the parental relationship is an impediment to permanent placement in an adoptive home. A.M.F., 1 Wn.3d at 418.

As part of the consideration of this element, RCW 13.34.180(f)[5] includes a special mandatory provision for incarcerated parents:

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(f). Assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
> (ii) The parent's efforts to communicate and work with the department or other individuals for the purpose of complying with

---

[5] RCW 13.34.180(f) also includes a requirement for consideration of guardianship: "the court must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child." The possibility of guardianship was a significant issue below. In January 2022, C.T. put forward a distantly-related family, the Laings, as potential guardians for K.S.T. and asked to have her placement changed from her foster family to the Laings. The Department objected to the change in placement, and the court agreed. Mrs. Laing testified at the termination trial, and C.T. raised guardianship again. The Department had also discussed guardianship with the foster family but they declined, favoring adoption. C.T. does not raise the issue of guardianship on appeal.

the service plan and repairing, maintaining, or building the parent-
child relationship;
(iii) A positive response by the parent to the reasonable efforts of
the department;
(iv) Information provided by individuals or agencies in a reasonable
position to assist the court in making this assessment, including but
not limited to the parent's attorney, correctional and mental health
personnel, or other individuals providing services to the parent;
(v) Limitations in the parent's access to family support programs,
therapeutic services, and visiting opportunities, restrictions to
telephone and mail services, inability to participate in foster care
planning meetings, and difficulty accessing lawyers and
participating meaningfully in court proceedings; and
(vi) Whether the continued involvement of the parent in the child's
life is in the child's best interest.

RCW 13.34.145(5)(b). Formal findings are not required, but the court must

consider these factors on the record. Matter of K.J.B., 187 Wn.2d 592, 604, 387

P.3d 1072 (2017). The statute does not mandate the weight to be given to the

incarceration considerations. Matter of Welfare of E.D., 195 Wn. App. 673, 695,

381 P.3d 1230 (2016). "[N]o more than 'consideration' is required." Id. Weighing

all factors in favor of the incarcerated parent does not compel the conclusion that

termination is unwarranted. Id. at 694-95. The legislature requires consideration

of the factors, but "it did not direct trial courts to disregard the negative effects

that incarceration may have on a delicate parent-child relationship. It also did not

direct the trial court to ignore the child's need for timely permanency." Id. at 695.

The parties dispute whether C.T. is incarcerated within the meaning of

RCW 13.34.145(5)(b) because he is no longer in prison, but remains under the

authority of DOC through GRE. Regardless of whether C.T. is deemed

incarcerated, the trial court did consider the .145(5)(b) factors on the record:

17

(i) [C.T.] has expressed and acted in ways which manifest concern for [K.S.T.]; (ii) beginning sometime after his incarceration at the penitentiary, [C.T.] made diligent efforts to communicate and work the department to comply with his service plan and attempt to build a parent-child relationship; (iii) [C.T.] had positive responses to the reasonable efforts of the department; (iv) the court has considered information from a variety of sources in making this assessment; (v) [C.T.] was limited in his ability to access family support programs, therapeutic services, and visiting opportunities while in the penitentiary; now, his limitations are that he must plan those events the Wednesday before the week they will occur; there is no evidence that [C.T.] was restricted in using the telephone or mail while in the penitentiary or now; there is no evidence that [C.T.] was unable to participate in foster care planning meetings while in the penitentiary or now; and there is no evidence that [C.T.] had difficulty accessing his lawyers or participating meaningfully in court proceedings while in the penitentiary or now; and (vi) an assessment of [K.S.T.'s] best interest would not change this analysis. Having considered the statutory factors, the court finds that while [C.T.] has since 2020 made efforts to begin the process of building toward a meaningful role in [K.S.T.'s] life, he has not "maintain[ed] a meaningful role in" her life.

The trial court went on to discuss whether the Department made reasonable efforts and whether particular barriers existed—factors required to be considered by RCW 13.34.180(f).

These formal findings satisfy the minimal requirement of "consideration." The favorable findings do not require the court to conclude C.T.'s parental rights should not be terminated.[6] The record amply supports the court's conclusion that prior to prison, C.T. had no role in K.S.T.'s life and has needed to build one.

---

[6] For example, C.T. asserts that the court correctly determined that his lack of housing was not a barrier to reunification and transition to placement could begin within two months if he could find housing that would allow overnight visits. But this oversimplifies the situation. C.T. would have to demonstrate long-term sobriety and ability to parent, and K.S.T. would need to become comfortable and secure with him in a parental role. Transition would require significantly more than a suitable place for K.S.T. to live. In contrast, K.S.T. is in a stable foster home seeking to adopt her.

Other than immediately after birth in July 2018, C.T. had not seen or interacted with K.S.T. until video visits from prison began in 2020. He was attempting to forge a relationship from scratch through video visits and a few in-person meetings after release on GRE.

While there was evidence that C.T. has put in effort at rehabilitation and building a connection with K.S.T., the court determined that continuation of the parent-child relationship diminishes her early integration into a stable and permanent home. Substantial evidence supports this finding. K.S.T. has lived with her foster family since she left the hospital shortly after birth. Her foster family wants to adopt her, but cannot do so while C.T. maintains his parental rights. Because the legal parental relationship is an impediment to K.S.T.'s adoption, RCW 13.34.180(f) is satisfied.

### III.    Unfit to Parent

C.T. contends the trial court erred by finding him unfit to parent because he had rapidly transitioned from fully supervised to unsupervised visits, and home detention under the graduated reentry program allowed him to parent. The State claims that C.T. was unfit to parent because he could not build the necessary parental relationship with K.S.T. in the near future. We agree with the State that substantial evidence supports the trial court's finding of current unfitness.

Parents have a constitutional due process right not to have their parental rights terminated without a finding of fact of current unfitness to parent. B.P., 186

Wn.2d at 313. "In order to prove unfitness, the State must show that the parent's deficiencies make him or her incapable of providing 'basic nurture, health, or safety.' " Id. (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2004)). A trial court's finding that the six statutory elements have been met constitutes an implicit finding of unfitness. B.P., 186 Wn.2d at 313. Here, the trial court found the elements had been met. As discussed above, substantial evidence supports these findings. Therefore, there is an implicit finding that C.T. is unfit to parent.

The trial court made several additional findings of fact about C.T.'s fitness. The court found that C.T. does not have "an established relationship with K.S.T." and "lacks developmentally appropriate parenting knowledge" such that he does not understand her daily needs.[7] The court noted that K.S.T. had shown signs of stress after recent in-person visits, which shows that "it will take a long time for [K.S.T.] and [C.T.] to build a relationship such that the parenting of [K.S.T.] could be safely and successfully transition from foster parents."[8] The trial court found that C.T.'s unremediated parental deficiencies made him incapable of providing conditions necessary for K.S.T.'s "basic nurture," and "he has much work to do to establish and then maintain a stable and drug-free life that will ensure that he is able and available to safely parent K.S.T."[9] Finally, the court considered the

---

[7] Finding of fact 2.14.2 (at Clerk's Papers (CP) 1333). The trial court mis-numbered some of the findings of fact. The subsections for 2.12 Prospects for early integration into a stable and permanent home are numbered as 2.14.1-2.14.5. The section on fitness is also labelled 2.14. To avoid any confusion, we include citations to the CPs for these findings of fact.

[8] Finding of fact 2.14.3 (at CP 1333).

[9] Finding of fact 2.14.4 (at CP 1334).

preapproved weekly schedule required by DOC as a hindrance because, "parenting a child of [K.S.T.'s] age requires flexibility" which is "unavailable to C.T. until October 2023, at the earliest."[10]

C.T. has made a concerted effort and real progress toward being able to parent. But the testimony shows he has just begun to build a relationship with K.S.T. and cannot yet meet any of her needs. As a result, substantial evidence supports that C.T. is currently unfit to parent.

IV.     Best Interests of the Child

C.T. claims the trial court erred by concluding that termination was in K.S.T.'s best interests because termination would alter the relationship between K.S.T. and her older sisters, and C.T. was engaged in parenting classes to help strengthen his parenting skills and bond with K.S.T. The State argues termination was in K.S.T.'s best interests because C.T. had "a negligible relationship with his child and could not strengthen it to significance within K.S.T.'s near future." We agree that termination was in the best interests of the child.

Once the Department establishes the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the trial court must determine whether termination of parental rights is in the child's best interest. RCW 13.34.190(1)(b); T.R., 108 Wn. App. at 166-67. The criteria for establishing the best interests of the child are largely dependent on the facts and circumstances of the case. Matter of Dependency of J.D.P., 17 Wn. App. 2d 744, 760, 487 P.3d 960 (2021).

---

[10] Finding of fact 2.14.5 (at CP 1334).

Here the trial court considered whether termination would impact sibling relationships, K.S.T. and C.T.'s relationship, and K.S.T.'s need for permanency.

First, in finding 2.15.1, the trial court found that an order of termination would not negatively impact any siblings. K.S.T. had two half-sisters but did not have a relationship with them. C.T. does not assign error to this finding; thus, it is a verity on appeal. In re Est. of Jones, 152 Wn.2d at 8. Without a current relationship between the siblings, substantial evidence supports the court's findings of no negative impact.

As to the relationship between C.T. and K.S.T., the trial court found that due to C.T.'s decisions "(a) he did not establish a relationship with [K.S.T.] prior to his incarceration, (b) his relationship with her now is undeveloped, and (c) [K.S.T.] experiences considerable stress while in his care."[11] Evidence before the court supports the underdeveloped nature of the relationship between C.T. and K.S.T. While the in-person visits seemed to go well, C.T. did not know K.S.T.'s habits, routines, or daily activities.

The two had a good rapport during in-person visits, but K.S.T.'s foster mother reported signs of stress. She noted that K.S.T. was less excited about in-person visits than she had been for video visits and sometimes expressed that she did not want to go. Normally a reluctant napper, K.S.T. sleeps on the way home from visits, which her foster mom attributes to K.S.T. relaxing after the

---

[11] Finding of fact 2.15.2.

emotional stress of the visits. K.S.T. has also begun acting less independent and needier with her foster parents.[12]

Based on this testimony, the relationship between C.T. and K.S.T. is still at an early stage, with a long timeline until C.T. could parent full-time and reunify with K.S.T. K.S.T. has lived with the same stable foster home for almost all of her four years. She is happy and meeting all of her milestones appropriately. The foster parents want to adopt her. Given the relatively undeveloped relationship between C.T. and K.S.T. and the time still ahead before C.T. will remedy his parenting deficiencies and be able to meet her needs, we conclude that the trial court did not err in determining that termination is in K.S.T.'s best interests.

Affirmed.

Chung, J.

WE CONCUR:

Birk, J.                    Dwyer, J.

---

[12] C.T. argues that the foster mother was biased and the court incorrectly relied on her testimony about K.S.T.'s alleged signs of stress after his visits. The trial court found her testimony credible. The appellate court does not weigh evidence or the credibility of witnesses. Saint-Louis, 188 Wn. App. at 914.